**Reversed and Rendered in Part, Affirmed in Part, and Opinion filed October 25, 2017.**



In The

# Fourteenth Court of Appeals

### NO. 14-17-00355-CV

## IN THE INTEREST OF J.E.M.M & L.A.M.M, CHILDREN

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2016-00027J**

## O P I N I O N

In this accelerated appeal, a mother seeks reversal of the trial court's judgment terminating her parental rights to two children. She challenges the legal and factual sufficiency of the evidence to support the trial court's findings on two predicate grounds and its finding that termination is in the best interest of the children. We conclude no evidence supports two of the three predicate findings. Though we conclude the evidence is legally and factually sufficient to sustain the finding under the third predicate ground, we conclude the evidence is legally insufficient to support the best-interest finding. The mother has not challenged the

trial court's appointment of the father as the children's sole managing conservator. So, we reverse the trial court's judgment terminating the mother's parental rights, render judgment denying the Department of Family and Protective Services' requests to terminate the mother's parental rights, and affirm the remainder of the trial court's judgment.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

M.L.M.-F. ("Mother") and J.A.M.-C. ("Father") are the natural parents of the two young children at the center of this controversy — J.E.M.M. ("Julian"), a four-year-old boy with autism and L.A.M.M. ("Lauren"), a 19-month-old girl. Until a few weeks before the Department became involved with the family, Father, Mother, Julian, and Lauren all lived together in an apartment in Houston, where the family made their home.

Father served as the family's breadwinner, working a day job while Mother devoted her efforts to caring for the children and managing the household. Mother did not work outside the home, in part, because she suffers from rheumatoid arthritis, a condition that causes her to endure painful and unpredictable flare-ups. In September 2015, Mother suffered a flare-up and entered the hospital for medical treatment of the condition, which had grown worse in recent years. Following Mother's hospitalization, her doctors prescribed medications to treat the disease. At times, the medications made Mother "feel out of it." When Mother stopped taking the medications, she felt better. During the times Mother was on medications, she depended on Father for help with the children.

In mid-December 2015, Father moved out of the family home, marking the beginning of a marital separation with Mother. After Father left, Mother remained in the apartment with the couple's young children. She had scant resources.

2

Without her husband's presence or support and with no other adult living in the home, Mother had to manage the children by herself. That same month, Mother's son from a prior relationship ("Frank") traveled to Texas from Pennsylvania to visit family over the Christmas break. Frank was nearly 11 years old. In Father's absence, Frank was a help to Mother.

A few weeks after Father moved out, Mother was doing the family's laundry at the apartment complex's laundry facility. During her runs from the family's apartment to the laundry facility in the same building, Mother left Frank to watch Julian and Lauren. While Mother was in and out of the apartment doing laundry, the three children remained in the apartment without another adult present.

After returning to the apartment from taking clothes out of the dryer, Mother found Lauren lethargic. Frank told Mother that the toddler had run into the kitchen table. Mother called 911 and an ambulance transported Lauren to the hospital emergency room. Mother told medical personnel what happened, passing along Frank's account of the kitchen-table accident. At the hospital, medical providers reported that Lauren had suffered a serious head injury.

Though Lauren fully recovered from the head injury, she spent a few weeks in the pediatric intensive care unit before being discharged.[1] At the beginning of Lauren's hospital stay, medical personnel noticed the toddler had a bruise on her left forehead and right cheek. She also had child-size bite marks on her abdomen. A medical scan revealed bilateral subdural hematomas and initially that raised concerns of non-accidental trauma. The day of Lauren's hospitalization, the Department received a referral alleging possible physical abuse of Lauren. An investigation followed.

---

[1] Lauren was medically cleared on January 4, 2016.

*The Department's Investigation*

As part of the Department's investigation, a Department representative spoke with Lauren's treating physicians and nurses. Lauren's medical providers noted concerns about an old bruise on the child's cheek and bite marks on her abdomen. Mother reported Lauren had bumped into a door, getting a bruise, three days before the hospitalization. Mother said she was not aware of the bite marks.

Medical personnel reported to the Department that the head injury Lauren sustained could be consistent with the history (kitchen-table accident) Mother provided. The medical evidence was not inconsistent with the child suffering the head injury by running into a table. Additionally, the medical records indicated Lauren, who was an active toddler, had recent, minor head injuries, which would explain the minor facial bruising. Though there was no explanation for the bite marks on the child's abdomen, hospital personnel noted that the bite marks appeared to have been made by a child. No criminal charges came out of Lauren's injuries.

*The Department's Temporary Conservatorship of the Children*

The Department took possession of Julian and Lauren on December 31, 2015, the day after Lauren entered the hospital. Within a week, the Department filed a petition seeking to become temporary managing conservator of Julian and Lauren. Frank returned to his father in Pennsylvania.[2]

After Julian and Lauren went into the Department's care, Mother visited them regularly, never missing a scheduled visitation. Though the Department's initial goal was family reunification with both parents, in June 2016, the Department became concerned with Mother's ability to care for the children on her own and changed its goal to reunification with Father only. After the Department

___
[2] Mother's parental rights as to Frank are not involved in the present suit.

decided to seek termination of Mother's parental rights, the trial court, at the Department's urging, discontinued Mother's scheduled visitation. In January 2017, the Department placed the children in Father's care, without giving Mother access or visitation. At the time of trial, Mother had not been permitted to see the children for months.

*The Department's Suit to Terminate Mother's Parental Rights*

In seeking termination of Mother's parental rights to Julian and Lauren, the Department asserted predicate grounds under Texas Family Code sections 161.001(b)(1)(D), (N), and (O).[3] Following a bench trial, the trial court terminated Mother's parental rights, citing the predicate findings under all three sections. The trial court also found that termination of Mother's parental rights was in the children's best interest. Though Mother and Father remained married, the trial court terminated Mother's parental rights and appointed Father as sole managing conservator. In this appeal, Mother challenges the termination of her parental rights.

## II.    ISSUES AND ANALYSIS

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1); and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2) (West Supp. 2016); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Mother raises three issues on appeal. In her first and second issues, Mother challenges the trial court's findings under sections 161.001(b)(1)(D) and (N). In her third issue, Mother challenges the trial court's finding that

---

[3] The numbering of section 161.001 changed effective April 2, 2015. Section 161.001(1) is now section 161.001(b)(1). Although the trial court's judgment cites the previous version, Mother's case began after April 2, 2015, and so the current version applies to Mother's case and that is the version to which we refer in this opinion.

5

termination of her parental rights is in the children's best interest.

## A. Standard of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.–Houston [14th Dist.] 2012, no pet.). Despite the constitutional magnitude of parental rights, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."). Due to the severity and permanency of the termination of parental rights, the law imposes a heightened burden of proof, requiring clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002).

"Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.–Houston [14th Dist.] 2008, no pet.). In reviewing the legal sufficiency of the evidence in a termination case, we consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at

6

266.

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id*. at 109.

## B.     Predicate Termination Grounds

The trial court terminated Mother's parental rights based on its predicate findings under Texas Family Code sections 161.001(b)(1)(D), (N), and (O). Termination of parental rights is warranted under these respective sections if the fact finder finds by clear and convincing evidence, in addition to the best-interest finding, that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
> ***
> (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:
>> (i) the department has made reasonable efforts to return the child to the parent;
>>
>> (ii) the parent has not regularly visited or maintained significant contact with the child; and

7

(iii) the parent has demonstrated an inability to provide the child with a safe environment; [or]

\*\*\*

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (N), (O).

### 1. *Predicate Finding under Subsection D – Endangerment*

The trial court found that Mother "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children." *See id.* § 161.001(b)(1)(D). "Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). Endangerment under subsection D focuses on evidence related to the child's environment. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home. *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection D. *See In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Yet, subsection D is not a basis for termination of parental rights if the parent was unaware of the endangering environment. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). So, in scrutinizing the endangerment finding, we focus not only on

8

evidence of endangerment but also on evidence showing the parent's awareness of the endangering environment.

The evidence in today's case does not establish exactly how long the three children were in the apartment without an adult present, but the evidence shows that when Lauren's head injury occurred, Mother had been gone for 13 minutes and remained in the building during that period. Julian and Lauren were never alone in the apartment. Frank was there the entire time.

In a perfect world, adult supervision of young children would be an option available to all parents at all times and in all circumstances. In Mother's world, that option was not available. Her circumstances forced hard choices. After Father left the home, Mother became a de facto single parent. She had no child-care support and no other adult living in the home. Mother chose to leave her almost 11-year-old son in charge of the younger children while she left the family's apartment to get clothes from a dryer in an on-site laundry facility — a chore that took her out of the apartment (but not out of the building) for 13 minutes. The trial court found that this conduct constituted endangerment. Our task on appeal is to determine if the record contains legally sufficient evidence to support this finding.

A child is endangered when the environment creates a potential for danger and the parent is aware of the danger but consciously disregards it. *See In re M.R.J.M.*, 280 S.W.3d at 502; *In re S.M.L.*, 171 S.W.3d at 477. Parental rights may be terminated under subsection D based on a single act or omission. *See In re D.M.K.*, No. 14-13-00230-CV, 2013 WL 5347392, at *10 (Tex. App.—Houston [14th Dist.] Aug. 27, 2013, no pet.) (mem. op.). In evaluating endangerment under subsection D, the court is to consider the children's environment before the Department obtained custody. *See In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.— Houston [14th Dist.] 2005, no pet.). Mother, who had no prior history with the Department, contends the Department presented no evidence regarding the

children's living environment when they were removed, no evidence that leaving Julian and Lauren with Frank posed a danger, and no evidence that Mother knew or believed that doing so would pose a danger.

The Department contends Mother ignored the danger presented by leaving Julian and Lauren in the care of Frank, who was 10-3/4 years old at the time. The Department contends Frank could not provide adequate supervision for Julian and Lauren and Mother knew leaving them in the apartment without adult supervision would expose them to injury. The Department relies on evidence of Lauren being an active child who falls often and runs into things. The Department additionally contends the trial court could have discredited the statements that there was no explanation for Lauren's bite marks and instead concluded that Julian caused the bite marks based on a note in the medical records indicating the preschooler had bitten others. According to the Department, leaving a 10-3/4-year-old to supervise younger siblings with these propensities (Lauren's falling/running into things and Julian's biting), even for a short period, amounts to subsection-D endangerment.

The Department relies on two cases in support of its contention. *See A.R. v. Tex. Dep't of Fam. and Protective Servs.*, No. 03-16-00143-CV, 2016 WL 5874874 (Tex. App.—Austin Oct. 4, 2016, no pet.) (mem. op.); *In re M.D.V.*, No. 14-04-00463, 2005 WL 2787006 (Tex. App.—Houston [14th Dist.] Oct. 27, 2005, no pet.) (mem. op.). Neither case presents analogous facts.

In the first case — *A.R.* — two parents left their 11-month-old child home alone while they left the premises and went to a pawn shop, where they were arrested. *A.R.*, 2016 WL 5874874, at *1. A police officer found the child at home, alone, in a bassinet. *Id.* Though the child was happy and uninjured when found, evidence showed the child could have fallen out of the bassinet and suffered injury or been suffocated by a pillow and blankets. *Id.* at *3. The court stated "[l]eaving

10

an infant alone can constitute endangerment under the Family Code." *Id.*, citing, *In re M.C.*, 917 S.W.2d at 269-70;[4] *In re R.D.S.*, No. 14-09-00980-CV, 2010 WL 4882457, at \*5 (Tex. App.—Houston [14th Dist.] Nov. 30, 2010, no pet.) (mem. op.).[5] But, Mother did not leave Julian and Lauren alone. (Frank was there). And, though Mother left the apartment, she was gone only a short time and stayed on the premises.

In the second case — *In re M.D.V.* — the court scrutinized the mother's failure to adequately supervise the children in connection with the evidence supporting the trial court's findings under subsection E.[6] The evidence included a report that the mother left her older child, who was disabled and lacked mental maturity, unattended and alone. *In re M.D.V.*, 2005 WL 2787006, at \*5. Additionally, the mother's drug use impaired her ability to adequately monitor the children's well-being. *Id.* Further, the mother's two-year-old daughter wandered out of the home by herself and was found by two passersby near a busy street. *Id.* Other evidence showed that the mother failed to supervise the children during the Department's visits, including the mother being on a phone in the dining room while the two-year-old was in a bathtub full of water. *Id.* at \*6. The court stated

---

[4] In *In re M.C.*, the children were left alone in potentially dangerous situations on two occasions and the children lived in extraordinarily unsanitary conditions and mother was unresponsive to their health problems. *See id.*, 917 S.W.2d at 269-70.

[5] The court in *In re R.D.S.* upheld the trial court's termination under subsection E based on evidence the mother left the child for an unspecified amount of time while the mother engaged in prostitution, the purported babysitter was not in the room when the mother returned with law enforcement, the mother did not have stable housing, and the mother could not provide contact information of the child's caregiver while the mother was incarcerated. *See id.*, 2010 WL 4882457, at \*5.

[6] "Subsection (D) concerns the child's living environment, rather than the parent's conduct, though parental conduct is certainly relevant to the child's environment." *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). "Under subsection (E), the cause of the endangerment must be the direct result of the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission." *Id.*

11

that "parental neglect can be as dangerous to the well-being of a child as direct physical abuse." *Id.*, citing, *In re M.C.*, 917 S.W.2d at 270. The court found this evidence could have enabled the fact finder to form a firm belief that mother's "failure to protect or supervise her children jeopardized or exposed [the child] to loss or injury." *Id.* Our record does not contain these elements. Mother did not leave Julian and Lauren unattended or alone.

Leaving young or disabled children alone, without any supervision at all, is not the same as leaving them in the care of an older child. Though Frank was just 10-3/4 years old, the record shows he had been helping Mother with childcare tasks like changing a diaper and playing with Julian and Lauren. The Department points to nothing except Frank's age to say that he was incapable of supervising the younger children during Mother's brief runs to the on-site laundry facility. And, no evidence showed Frank — by commission or omission — caused Lauren's injury or that Lauren's injury would not have occurred if an adult had been present. The record contains evidence that after Lauren's hospitalization for the head injury, Mother heard through a family member that Frank had "aggressive and impulsive tendencies" and, at one point, Mother's counsel suggested that Frank might have caused Lauren's injuries. But, the record contains no evidence that Frank demonstrated aggressive or impulsive behavior toward Lauren or Julian (or any other young child) or was neglectful or abusive toward his half-siblings (or any other young children); or engaged in any other behavior that would have put Mother on notice that Frank was an unsuitable caregiver for Julian and Lauren. Mother's own experience with Frank led her to believe "he was a sweet, innocent child." Mother stated that had she believed otherwise, she would not have left Julian and Lauren in Frank's care.

Though an adult might be more capable of managing risks, a near 11-year-

old with a track record of helping provides greater protection than leaving no one to supervise, as occurred in the cases the Department cites. Leaving Frank to supervise his younger siblings was not without risks, but the record contains no clear and convincing evidence that Mother showed a conscious disregard of those risks. Mother mitigated the risks by remaining in close proximity to the children (in the same building) and returning quickly.

Leaving a 10-3/4-year-old to supervise younger children is not an ideal choice, even for a short time, but the evidence in this case is not legally sufficient to support a finding of endangerment. While it may have been a less-than-ideal situation, "[l]iving conditions that are merely 'less-than-ideal' do not support a finding under [subsection D]." *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Further, to sustain a judgment based on a subsection-D finding, the record must contain legally sufficient evidence that the parent was aware of the endangering environment. *See In re S.M.L.*, 171 S.W.3d at 477. The Department contends clear and convincing evidence established that Mother "left her children without adequate supervision in the knowledge that they were likely to be injured" because Lauren was accident-prone and Julian had a history of biting other children.

Toddler-running-and-bumping accidents can happen with or without adult supervision. The evidence shows that Lauren was an energetic child who was prone to falls and collisions. No evidence showed Lauren's head injury would not have occurred had an adult been present. Likewise, assuming Julian inflicted the bite marks on his little sister,[7] no evidence suggests that an adult could have

---

[7] No witness testified to seeing Julian inflict the bite marks on Lauren, but evidence showed the bite marks were those of a child and, as a member of the household, Julian had access to Lauren. When questioned about the bite marks, Mother said she was unaware of them and did not know what caused them, though she offered a few guesses. Mother suggested that the marks on Lauren's abdomen might have been made by medical instruments or possibly by a rat

stopped him from biting her. The child-bites Lauren received did not cause serious or permanent injury. Notably, the record does not show any other incidents of Lauren being bitten. So, even if the trial court disregarded the evidence that Mother was unaware of how the bite marks occurred and instead found that Julian bit Lauren, the record contains no evidence that Mother knew of the biting behavior or could have predicted the preschooler would bite the toddler or that Mother or any other adult could have prevented the bites.

Though Lauren suffered child-bites as well as a serious head injury in a less-than-ideal environment, subsection D requires proof that Mother knowingly exposed the children to an endangering environment. *See In re A.L.H.*, 468 S.W.3d 738, 747 (Tex. App.—Houston [14th Dist.] 2015, no pet.). The record contains no evidence that Mother consciously disregarded a known danger. Though termination under subsection D can stand on a single act or omission, the evidence does not support the subsection-D finding in today's case. *See In re D.M.K.*, 2013 WL 5347392, at *10 (termination under subsection D permitted based on single act or omission). Reviewing all the evidence in the light most favorable to the finding, we conclude a reasonable fact finder could not have formed a firm belief or conviction that Mother "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children." Accordingly, we sustain Mother's first issue.

### 2.    *Predicate Finding under Subsection N – Constructive Abandonment*

The trial court found that Mother "constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the children

_____

in the apartment.

14

to the mother; (2) the mother has not regularly visited or maintained significant contact with the children; and (3) the mother has demonstrated an inability to provide the children with a safe environment, pursuant to §161.001[b](1)(N), Texas Family Code." *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N).

Mother concedes that Julian and Lauren were in the Department's temporary conservatorship for not less than six months and the Department made reasonable efforts to return the children by implementing the family service plan. *See In re V.D.A.*, No 14-14-00561-CV, 2014 WL 7347776, at *3 (Tex. App.—Houston [14th Dist.] Dec. 23, 2014, no pet.) (mem. op.) ("[i]mplementation of a family service plan by the Department is considered a reasonable effort to return a child to its parent."). But, Mother contends the Department failed to meet its burden in establishing that Mother has not visited regularly or maintained significant contact with the children and has demonstrated an inability to provide them with a safe environment.

The Department has not addressed Mother's contentions regarding subsection N. The Department's caseworker testified that Mother had visited Julian and Lauren consistently "[u]p until the Court ordered visitation be discontinued" in October 2016. The record does not include the reason Mother's visitation was suspended.

The record does not contain legally sufficient evidence of constructive abandonment. Reviewing all the evidence in the light most favorable to the finding, we conclude a reasonable fact finder could not have formed a firm belief or conviction that Mother "has not regularly visited or maintained significant contact with the children." If the evidence is insufficient on any one of the elements, the termination finding cannot be upheld on that ground. *See In re A.L.H.*, 468 S.W.3d at 744. Having concluded the evidence is legally insufficient to

support the predicate finding under subsection N, we sustain Mother's second issue.

### 3. Predicate Finding under Subsection O – Failure to Complete Court-Ordered Requirements

Mother concedes the legal and factual sufficiency of the evidence to support termination of her parental rights under subsection O. The Texas Legislature recently amended the Family Code to provide that termination may not be ordered under subsection O "based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of the evidence that (1) the parent was unable to comply with specific provisions of the court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent."[8] We decide this case under the former, less forgiving standard that governs this appeal. We have reviewed the record under this standard and conclude that the evidence is legally and factually sufficient to support the trial court's determination under section 161.001(b)(1)(O).[9]

---

[8] See Tex. Fam. Code Ann. § 161.001(c) (West, Westlaw through 2017 1st C. Sess.).

[9] "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." See In re A.V., 113 S.W.3d 355, 362 (Tex. 2003). Though normally we would not need to review the sufficiency of the evidence to support the subsection-D and subsection-N findings, Mother urged us to do so, citing decisions from this court supporting a sufficiency review of the subsection-D finding because that finding may result in negative collateral consequences in the future under subsection M. See In re S.G.F., 2017 WL 924541, at *4; In re A.A.L.A., No. 14-15-00265-CV, 2015 WL 5437100, at *4 (Tex. App.—Houston [14th Dist.] Sept. 15, 2015, no pet.) (mem. op.); In re J.J.G., No. 14-15-00094, 2015 WL 3524371, at *4 (Tex. App.—Houston [14th Dist.] June 4, 2015, no pet.) (mem. op.). Subsection M permits termination when the parent had their parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of subsection D. See Tex. Fam. Code Ann. § 161.001(b)(1)(M). Additionally, Mother urges us to review the sufficiency of the evidence supporting the findings under subsections D and N because those findings can be used to support the best-interest finding. See In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).

## C.    *Best Interest of the Children*

Texas courts presume that keeping children with their natural parent serves the children's best interest. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The Department carries the burden of rebutting that presumption. *Id.* Proof of acts or omissions under section 161.001(b)(1) is probative of the issue of the children's best interest. *See In re S.R.*, 452 S.W.3d at 366. The considerations the trier of fact may use to determine the best interest of the children, known as the *Holley* factors, include:

(1) the desires of the children;

(2) the present and future physical and emotional needs of the children;

(3) the present and future emotional and physical danger to the children;

(4) the parental abilities of the persons seeking custody;

(5) the programs available to assist those persons seeking custody in promoting the best interest of the children;

(6) the plans for the children by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parents' acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d at 230; *see also* Tex. Fam. Code Ann. § 263.307(b) (West 2014) (listing factors to consider in evaluating parents' willingness and ability to provide the children with a safe environment). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

We begin our analysis with the presumption that keeping Julian and Lauren with Mother, their natural parent, will serve the children's best interest. *See In re*

*D.R.A.*, 374 S.W.3d at 533. We also presume that prompt and permanent placement of the children in a safe environment is in the children's best interest. *See* Tex. Fam. Code Ann. § 263.307(a) (West 2014).

### 1.    *Predicate Grounds under Section 161.001(b)(1)*

Evidence supporting termination under the grounds listed in section 161.001(b)(1) can be considered in support of a finding that termination is in the children's best interest. *See In re C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest). Because we have found the evidence under subsections D and N legally insufficient, we do not consider that evidence or those findings in connection with the best-interest determination.

### 2.    *Holley Factors*

#### *Children's Desires*

The record contains no evidence that would suggest any basis upon which to conclude that Julian and Lauren desire termination of their relationships with Mother. Though the record contains little or no direct evidence of the children's desires (perhaps because of their tender ages or difficulty communicating), the record contains ample evidence that the children have bonded with Mother.

Until the children's removal to foster care, Mother was the children's primary caregiver. She nurtured them and attended to their daily needs. Testifying about his observations up until he moved out of the family home two weeks before Lauren's head injury, Father acknowledged Mother's positive relationship with Julian and Lauren, stating the children were "well cared for" by Mother, that Mother loves the children, and that the children love Mother. Mother also testified that she loves the children and that she misses them. The Department's caseworker

acknowledged that Mother visited the children while they were in the Department's care and did so consistently. The record contains nothing to suggest that the children desire to sever their relationships with Mother.

*Children's Present and Future Physical and Emotional Needs*

Lauren is a typically developing child. Julian has special needs due to his autism. Evidence of their present and future physical and emotional needs is meager for both children and lacking in any particulars that would show how or why termination of Mother's parental rights would improve the outlook for the children's needs.

Julian and Lauren have a natural connection to Mother, who remains married to Father. Testifying through an interpreter at trial, Father said he planned to divorce Mother and did not know "if it could make any use to give [Mother] some rights," later adding that he did not think it "would do any use to give her some rights." Father offered no reasons for his conclusion.

This case does not present an adoption scenario in which the Department urges termination of the natural mother's rights so that the children might find permanency through adoption into a new family. No evidence shows a potential adoptive mother on the horizon or any other mother figure in the children's lives. Nor does the evidence show that anyone else could or would fill the void that would be left by the children's loss of the maternal relationship — a loss that could have life-changing consequences given the children's young ages and Julian's autism diagnosis.

An autism diagnosis can impact the best-interest determination in significant ways. Though our record shows a mutual bond between Julian and Mother, it does not address how terminating Mother's parental rights might impact a child with autism or whether Julian's special needs would heighten or exacerbate his ability

19

to deal with the loss of this important parental relationship.

In considering children's special needs in the termination-of-parental-rights context, Texas courts have recognized that autism presents a unique set of ongoing challenges for parents whose children suffer from the disorder. Children with autism tend to have many distinct needs beyond those of a typically developing child — needs that require specialized therapies, interventions, and strategies to deal with the afflicted child's particular deficits and idiosyncratic behaviors. *In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pets. denied); *see also In re J.R.*, 501 S.W.3d 738, 746 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting autism requires a structured environment and constant supervision). But our record contains next to nothing about where Julian falls on the autism spectrum, the severity of his autism, or how his autism impacts his day-to-day functioning or long-term prospects. Likewise, the record contains little or no evidence of the scope of Julian's special needs or the degree to which his disability and daily care would be impacted by terminating Mother's parental rights. And, the record contains no evidence of the emotional effects Julian might suffer in that circumstance.

The Department points to no evidence that Mother failed to meet the particular challenges of parenting a child with autism or that Mother did not understand or properly respond to the diagnosis. Nor does the record contain evidence that Mother failed to meet any of Julian's autism needs or fell short in getting Julian services or therapies for autism. At times Mother was physically unable to get the child to school, but no evidence shows that Mother's parental response to Julian's autism was inappropriate or lacking. (The record does not address what, if anything, Father did to get Julian to school when Mother was physically unable to do so.) The record shows Father received special-needs parent

20

training and understands the diagnosis but is otherwise silent on these autism issues.

As autism cases show, bringing up a child with this challenging disorder can be difficult even for two parents equipped with resources and working together to support the autistic child. Our record contains no evidence that either now — or in what will be a lifelong struggle with autism — Julian would fare better with one parent than with two.

Though Lauren does not have special needs, the record contains no greater evidence of how terminating Mother's relationship with the young girl might impact Lauren's emotional development and well-being. As with Julian, our record contains no evidence of any other mother figure in Lauren's life. The record does not show how Lauren's best interest would be served — how her circumstances, now or in the future, would be improved — by severing all ties to Mother.

Considering the record evidence on this important factor in light of the Department's clear-and-convincing evidentiary burden and the parental presumption in favor of keeping children with their natural parents, we conclude this factor weighs heavily against termination of Mother's parental rights.

*Parenting Abilities*

The fact finder may consider a parent's parenting skills in a best-interest analysis. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). Father testified that Mother took good care of Julian and Lauren. At trial Mother testified that after the children went into the Department's care, she completed parenting classes through her church and that she can take care of the children and keep them safe.

At the Department's urging, Mother participated in a psychosocial

evaluation. Though the evaluation notes Mother's expressed love and commitment to her children, it also contains clinical impressions including "serious concerns over [Mother's] ability to adequately care for her children at this time." During the evaluation, Mother, whose native tongue is not English, made odd comments that prompted the clinician to ask whether Mother was speaking in jest. For example, Mother commented that the boy she was visiting at the Department was not Julian and that Lauren had Botox injections after coming into the Department's care. Though file notes indicate that Mother was observed (by someone not identified and whose credentials are not known) to have thoughts of paranoia and delusion, the record is undeveloped on this point. Nothing in our record shows Mother ever has been diagnosed or treated for any mental illness or disorder.

The Department had concerns about Mother's ability to adequately supervise her children due to her feeling "out of it" at times as a result of medications following Mother's hospitalization for rheumatoid arthritis just before Father moved out of the family home. During her psychosocial evaluation, Mother reported for the last several months she had stopped taking the medications and was feeling better. To illustrate the noted concerns about Mother, the clinician pointed to Mother's not knowing how Lauren received bruises, to Julian's teeth being in a poor condition,[10] and to Julian not attending school because Mother was unable to get him there. Because of these concerns, the clinician made recommendations for therapy and individual counseling if family reunification was the goal for the children. The evidence shows Mother did not complete the treatment recommendations. Mother's failure to do so is some evidence that she did not take advantage of the services the Department offered and so casts some

---

[10] Though there is evidence that Julian had dental issues, these issues arose during the period he was in both parents' care, so if these issues can be attributed to a lack of care (the record is unclear), the fault rests with both parents.

measure of doubt on her parenting abilities. *See In re M.S.D.*, No. 14-12-00801-CV, 2013 WL 593444, at *13 (Tex. App.—Houston [14th Dist.] Feb. 14, 2013, no pet.) (mem. op.). Evidence that Mother, knowing she needed to complete the counseling services to obtain the return of her children, did not do so indicates that she has not effected positive personal changes within a reasonable time. *See* Tex. Fam. Code § 263.307(b)(10), (11). We balance this evidence against the evidence of Mother's constructive parenting abilities. Evidence shows that when Mother had the children, they were "well cared for," and no evidence shows Mother ever neglected the children's needs, abused the children, or used inappropriate methods of discipline. Though evidence of Mother's failure to complete the service plan does not favorably impact the best-interest analysis, it also does not eliminate consideration of Mother's positive parenting abilities and track record.

*Proposed Placement and Stability of the Home*

The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the children's best interest. *See In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.–San Antonio 2014, no pet.). Texas courts recognize as a paramount consideration in the best-interest determination the child's need for permanence through the establishment of a "stable, permanent home." *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the children informs the best-interest determination. *See In re C.H.*, 89 S.W.3d at 28.

The children spent time in foster care, but in January 2017, more than a year after they came into the Department's care, they were placed into Father's care. Father remained married to Mother, though the couple continued to live apart. The Department caseworker testified that Father had completed his service plan and

23

had demonstrated an ability to provide the children with a stable, loving environment. The caseworker reported that since regaining possession of the children, Father has been responsible with them, enrolled Julian in school, and kept the children up-to-date with their medical and dental care. Father testified that the children were doing "super well" in his home.

Though Mother and Father remained married, the Department pointed to Mother's eviction from the apartment and lack of a new home of her own as Mother's failures. After Father left the family's apartment in December 2015, Mother had no money to pay the rent. Evicted from that apartment, with no apparent means of sharing in the marital income and with the couple's children in foster care, Mother went to live with her sister's family. In exchange for food and housing, Mother became the caregiver for her sister's children.

Even though neither Mother nor Father had filed for divorce, the Department did not give Mother any credit for marital assets, or income, in assessing the two parents' abilities to provide housing and financial support for the children. No evidence showed Father gave Mother any financial support after Father moved out; the record shows Mother's only source of income was the financial aid she received from her church. Considering that Mother and Father remained married and together had a track record of providing a stable home for the children, we could hardly conclude that Mother lacked the ability to provide a stable home merely because after Father moved out, Mother lacked financial resources.

The evidence shows that Father left the home during a time the family was particularly vulnerable due to Mother's illness and recent hospitalization and the lack of child-care support for the couple's toddler and autistic preschooler. These vulnerabilities, along with Mother's lack of financial resources while Father and

Mother lived apart, limited Mother's options in securing housing and employment after eviction from the apartment the family had shared.

This court has recognized that stability stands as the paramount consideration in the best-interest determination, yet no evidence shows how removing Mother from the children's lives would enhance stability or even maintain the stability two parents provide. Nor does the evidence address how other caregivers could fill the stability gap if the children's ties to Mother are severed permanently. Though the record contains evidence of "observations" noted in the clinician's file that raise concerns about Mother's mental health as well as evidence that Mother might benefit from the counseling and therapy services ordered but not completed, this evidence falls short of clear and convincing and is not sufficient to overcome the parental presumption that the best interest of children is served by leaving them in the care of their natural parents. This factor weighs against termination of Mother's parental rights.

*Availability of Programs to Assist the Person Seeking Custody in Promoting the Best Interests of the Child*

Other than the parenting classes, which Mother and Father both completed, the record contains no evidence that the Department offered or facilitated services that would address the Department's concerns about Julian's presumed biting of Lauren or how that behavior could be related to Julian's autism or how Mother and Father might become better equipped to deal with these behavioral issues through early intervention programs for young children with autism. Mother indicated she intended to seek government benefits as resources for the children. Though the record is not developed on this point, nothing suggests that terminating Mother's parental rights would promote the children's best interest vis-à-vis these potential resources.

*Acts or Omissions of the Mother and Any Excuse for Such Acts or Omissions*

Mother has no prior history with the Department, no history of drug abuse or committing family violence, no criminal history, and no mental-health diagnosis. Even though our record contains no legally sufficient evidence of endangerment or abandonment, Mother, testifying at trial through an interpreter, acknowledged that the children came into the Department's care because of her actions. She took responsibility for leaving the children in the apartment without another adult being present. She explained she was not "taking a stroll" or "going anywhere" but was taking care of the children's things and remained in the same building while she was doing laundry. Mother made it clear she did not intend to do the same thing again, stating that she was "not going to go do laundry anymore whenever I'm with them."

*Mother's Noncompliance with Court-Ordered Service Plan*

In determining the best interest of the children in proceedings for termination of parental rights, the trial court may properly consider that the parent did not comply with the court-ordered service plan for reunification with the children. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) ("Many of the reasons supporting termination under subsection O also support the trial court's best interest finding."); *see also In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (considering the failure to participate in services required for reunification in reviewing the best-interest determination). Mother conceded that she failed to complete her family-service plan. The Department caseworker testified that Mother completed a psychosocial evaluation, which resulted in recommendations, including a full psychological evaluation, parenting classes, and individual counseling. Mother did not complete all of the recommendations, so this factor does not weigh in Mother's favor.

26

### 3.    *Summation of the Best-Interest Analysis*

Having analyzed the evidence, we now turn to the pivotal question: whether a reasonable fact finder could form a firm conviction or belief that terminating Mother's parental rights is in the children's best interest. We conclude, based on the trial evidence, that no rational fact finder could form a firm belief or conviction that termination of Mother's parental rights is in Julian's and Lauren's best interest. *In re B.D.A.*, No. 01-17-00065-CV, 2017 WL 3141321, at *10–20 (Tex. App.—Houston [1st Dist.] July 24, 2017, no pet. h.).The record evidence falls short of the requisite legal standard and cannot support termination of Mother's parental rights. Accordingly, we sustain Mother's third issue.

## III.    CONCLUSION

Julian and Lauren have a natural and lifelong connection to Mother. Before the State of Texas can sever their relationship with her, they are entitled to a trial where the State was held to its burden of proof. Though we recognize the inherent limits of the appellate process and the possibility that additional facts, if proved at trial, might have led to a different result, we must hold the Department to the heightened standards. Termination of parental rights is serious business. The law requires clear and convincing evidence to sever the relationship between a parent and child and due process demands that the State document a sufficient measure of evidence in the record to support that outcome. *In re B.D.A.*, 2017 WL 3141321, at *20. The Department did not do so in this case.

Though we have concluded that the evidence is legally insufficient to support the termination of Mother's parental rights under either section 161.001(b)(1)(D) or (N), the evidence is sufficient to support a finding under section 161.001(b)(1)(O) as a ground for termination. Yet, there is no legally sufficient evidence that termination of Mother's parental rights is in the children's

best interest. Accordingly, we reverse the judgment of the trial court to the extent that the trial court terminated Mother's parental rights as to Julian and Lauren, and we render judgment denying the Department's requests to terminate Mother's parental rights as to Julian and Lauren. *See In re A.L.H.*, 468 S.W.3d at 747.

On appeal, Mother has not challenged the trial court's appointment of Father as sole managing conservator of the children or the trial court's findings in support of this appointment. The trial court did not make this appointment under Family Code section 161.207; rather, the trial court made the required best-interest findings to support the appointment of Father as sole managing conservator of the child. *See In re J.A.J.,* 243 S.W.3d 611, 615–17 (Tex. 2007). In this context, a challenge to the appointment of Father as sole managing conservator is not subsumed within Mother's challenge to the termination-of-parental-rights decision. *See id*. Accordingly, we affirm the remainder of the trial court's judgment. *See In re A.L.H.*, 468 S.W.3d at 747.


/s/    Kem Thompson Frost
Chief Justice


Panel consists of Chief Justice Frost and Justices Boyce and Jewell.