**Affirmed and Memorandum Opinion filed December 20, 2018.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00652-CV

## IN THE INTEREST OF E.M.G., A CHILD

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2017-03688J**

## M E M O R A N D U M   O P I N I O N

This accelerated appeal arises from a final decree in a suit in which termination of the parent-child relationship was at issue. *See* Tex. Fam. Code Ann. § 109.002(a-1) (West Supp. 2018). The trial court terminated the parental rights of W.M.K. (Mother) and M.G.L. (Father) with respect to their daughter, Evelyn,[1] and

---

[1] We use pseudonyms or initials to refer to the child, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d) ("On the motion of the parties or on the court's own motion, the appellate court in its opinion may identify the parties by fictitious names or by their initials only."); Tex. R. App. P. 9.8(b)(2) (in a case in which the termination of parental rights was at issue, "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member.").

appointed the Texas Department of Family and Protective Services (the Department) to be Evelyn's managing conservator.

Only Mother appeals the trial court's judgment. Mother challenges the factual sufficiency of the evidence supporting the trial court's finding that termination of her parental rights is in Evelyn's best interest. After reviewing the record evidence, we conclude factually sufficient evidence supports the trial court's finding that termination of Mother's parental rights is in Evelyn's best interest. *See id.* § 161.001(b)(2). Therefore, we affirm the trial court's judgment.

**BACKGROUND**

### A. Evelyn's Removal

The Department received a referral alleging that Evelyn, who was just under two years old at the time, was being physically abused by Mother. Among other things, the person making the referral stated that Mother regularly yells at Evelyn and beats her daily. According to the referral, when asked why she was "going off" on Evelyn, Mother responded that Evelyn knew "what she's doing" and was "just doing it to piss [Mother] off." The referral stated that Evelyn cries daily and has bruises up and down her legs. The referral also reported that Mother goes out every night and there were concerns about possible sexual abuse. According to the referral, Mother had a prior history with the Department, having tried to kill a Department worker by choking the worker. Mother was convicted of a felony and served three months in jail.

The Department assigned Dee Hull to investigate the allegation that Mother was abusing Evelyn. Hull authored a removal affidavit recounting her investigation of the referral. Hull reported that she arrived the next day at the house owned by E.N., where Mother and Evelyn were living. Hull described the house as uninhabitable with trash outside and leading into the open garage. Hull could see

2

the first floor of the house and she saw numerous dogs and cats, as well as trash strewn about. Hull also observed that the home was infested with fleas and smelled of feces and urine. In Hull's opinion, the home appeared to be that of a hoarder.

Mother came to the house's door, but she refused to allow Hull to enter. Mother also refused to provide Hull with her identification or telephone number. When asked about Evelyn's father, Mother declined to provide any information beyond what she believed his first name was and his nationality. Mother then told Hull that she had not seen Father for more than a year. After Hull informed Mother of the reason for her visit, Mother refused to get Evelyn, went back into the house, and closed the door.

## B. The trial

The next day, the Department filed its Original Petition for Protection of a Child for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship and Application for Writ of Attachment asking, among other things, to be named Evelyn's temporary managing conservator. The trial court signed an order appointing the Department Evelyn's temporary managing conservator as well as a writ of attachment for Evelyn the same day. During the resulting bench trial, numerous witnesses testified. We summarize their testimony below. Because Father has not appealed the trial court's decision terminating his parental rights, we focus on the evidence relevant to Mother.

### 1. Deputy Investigator Hausler

Deputy Investigator Steven Hausler of the Harris County Precinct 1 Constable's office was assigned to serve the writ of attachment the same day it was issued. Hausler eventually testified during the termination trial. According to Hausler, he and his partner went to E.N.'s house where Mother and Evelyn were

3

living. When he arrived, Hausler saw a large pile of trash and garbage in front of the house's garage. Hausler also noticed other debris scattered around the yard. Hausler went inside the house where he saw numerous animals, including dogs, cats, and turtles. He also observed numerous animal cages, as well as dog and cat droppings throughout the house. Hausler also saw roaches crawling throughout the house. Hausler testified that the smell of urine and dog feces pervaded the house. In Hausler's opinion, the house was not a safe place for a young child.

Hausler and his partner went up to the house's second floor where Evelyn and Mother were in a bedroom behind a closed door. Hausler entered the bedroom after knocking on the door, announcing he was the police, and that he and his partner were there to take Evelyn. Evelyn was lying in her crib when Hausler entered the bedroom. Hausler told Mother that he was there with a writ of attachment for Evelyn. Mother got off the bed, grabbed Evelyn, and told Hausler that she wanted to take Evelyn to the bathroom. Hausler told Mother that she could not do that because Evelyn could not leave his sight. At that point, Mother told Hausler that they were not taking Evelyn. Mother then went out into the hall where she handed Evelyn to E.N., who then handed Evelyn to Hausler. Mother then tried to strike Hausler with her fist. Hausler grabbed Mother's wrist before she was able to hit him. Hausler testified that Mother's attempted blow could have easily struck Evelyn. Hausler turned Mother over to his partner and then quickly left the house carrying Evelyn.

## 2. Evelyn's Father

Father identified himself as Evelyn's father. Father testified that there was already a Department referral regarding Evelyn while she was still in the hospital after birth. According to Father, he was living in his brother's apartment at the time and the Department checked out the apartment before allowing Evelyn to come

4

home with him. Mother was living with them as well. While they were living at his brother's apartment, Father's brother was arrested and convicted of possession of a controlled substance. When asked about how long Evelyn and Mother lived with him at his brother's apartment, Father testified that they lived with him for several months, until Evelyn was about seven months old. Father explained that Mother and Evelyn moved out of the apartment because his relationship with Mother was not working.

Father admitted that he fought with Mother, explaining that she would push him and he would push her back. Father denied that the police were called as a result of these physical altercations. Father did admit, however, that Evelyn was living in the apartment when the fights occurred. During cross-examination, Father eventually admitted that he locked Mother out of his residence and denied her access to Evelyn. Father then testified that Mother had to break open a window to get back into the residence. Finally, Father admitted that the police were called during that incident.

Father testified that he knew Mother had lost her parental rights to her other children. Father found out Evelyn was involved with CPS from his oldest son's mother, not from Mother. Father contacted the Department when he found out that Evelyn was in the Department's care. Father admitted that he had not provided child support for Evelyn since the Department's case began.

Father was also questioned about characteristics possessed by a good mother. Father believed that a good mother takes care of her children, is loving, and provides a good education. He also believed that a mother should provide a safe and stable environment for her children. Father testified that he believed that a good mother should provide financially for her children and also provide adequate shelter. Father then testified that, based on these qualities, he did not believe Mother was a safe

parent. According to Father, Mother's mental health is bad because she is bipolar. Father also testified that Mother has previously displayed such aggressive behavior that he did not want to be around her.

### 3. E.N.

E.N. testified that Evelyn started living in her house when Evelyn was two to three months old. E.N. picked Mother and Evelyn up after Father kicked them out of their residence. E.N. stated that she was with Mother and Evelyn all of the time, but she later admitted that she would occasionally leave them alone with each other. E.N.'s home was the house where Deputy Investigator Hausler executed the writ of attachment for Evelyn. E.N. admitted that allowing Evelyn to live in her home was not taking good care of her. According to E.N., Evelyn seems happy since she began living with her foster parents. E.N. agreed Evelyn would be better off staying in the foster placement.

### 4. Tamara Smith

Smith identified herself as Evelyn's conservatorship caseworker. According to Smith, Evelyn is Mother's fifth and youngest child. Smith explained that Mother's parental rights to her four older children had been terminated previously. Once Evelyn was removed from Mother, she was placed with the same family that had adopted two of her older siblings. Smith testified that Mother had not completed all of the services required by the Department's parenting plan, though she completed her psychological assessment, psychiatric assessment, parenting classes, and substance abuse assessment. Smith explained that Mother had not been consistent with committing to random drug screens. In fact, Mother tested positive for cocaine on at least one occasion since Evelyn's case began. Smith testified that at the time of trial, she did not know where Mother was residing, and Mother had not been able to maintain steady housing during the pendency of Evelyn's case.

6

Smith then turned to Mother's visitations with Evelyn. Smith stated that Mother had been visiting with Evelyn until her visitations were suspended due to Mother's inappropriate behavior. Before the visits were terminated, Mother would bring toys, food, and clothes for Evelyn. Smith explained that Mother used profanity in front of Evelyn and also threatened Smith in front of Evelyn. The threats had required Smith to call the security guard to intervene. Finally, Smith testified that Mother tried to lock herself in the bathroom with Evelyn on multiple occasions.

As to Evelyn's best interest, Smith stated that Mother had not demonstrated a willingness to admit to her mental health issues. Smith also reemphasized that Mother had not remained drug free throughout the life of the Department's case. Smith testified that the foster parents are willing to care for Evelyn and tend to her needs. According to Smith, Evelyn is developmentally delayed[2] and has an eye condition that requires care neither birth parent can provide.

### 5.    Mother

Mother stated that she has been living at her current residence for over a year. She admitted, however, that she has lived in three residences during the previous five years. Mother testified that she is self-employed painting walls and cleaning houses.

Mother also explained her connection with E.N. According to Mother, E.N. was married to Mother's "first ex." E.N. provided for Evelyn and Mother before and during the time when Mother lived with Father. Mother and Evelyn also lived in E.N.'s home for almost three months after they left Father's residence. Mother believed that E.N. had spent thousands of dollars on Evelyn. Mother admitted,

---

[2] Smith testified that it is suspected Evelyn may be autistic but she cannot be diagnosed until she is three years old.

however, that E.N.'s home was not a safe environment for Evelyn.

Mother testified that she had explored the idea of placing Evelyn up for adoption before Evelyn was born. Mother did this because Father was not the best choice to be a parent. Mother informed the court that Father hit her several times in the past. According to Mother, Evelyn was in the room when Father physically abused her. Mother testified that she sought help from a women's shelter, but every time she called one, someone would be at the house and shelter personnel would refuse to pick them up. Mother further testified that she suffers from high anxiety, which is why she takes clonazepam. Mother also testified that she has nerve damage from a back injury, which is why she takes barbiturates. Mother testified that her temper does get her into trouble in certain situations. Mother admitted that she had previously pled guilty to making a terroristic threat.

Mother explained that she had issues with the foster parents, who adopted two of her other children, because she believes the foster mother is a pathological liar. Mother admitted that she had selected the foster parents to adopt her first son. Mother further stated that the foster parents overmedicate her children in their care to the point of malnourishing their bodies. Mother explained that she believed Evelyn would be better off in her care because she knows how to take care of Evelyn. Mother testified that she and her daughter are bonded to each other. Mother made her concerns about Evelyn's physical appearance and health known to the caseworker. Mother stated she would be able to provide for Evelyn and she would be able to take Evelyn to her medical appointments, including those dealing with Evelyn's eye condition and glasses. Mother also testified that she has a support system in Houston: her mother, Evelyn's maternal grandmother.

Mother admitted that she had been diagnosed with PTSD, which she testified was the result of all the tragedies she had been through in her life. Mother testified

8

about an incident in which she had been held hostage for two days by the father of one of her older children. Mother stated that the child's father and another person held her for two days and beat her because Mother had told her child's father that it was wrong for him to abandon his son. Mother admitted that if Evelyn had been living with her, this could have created a very dangerous situation for Evelyn.

### 6. Foster Mother

Foster Mother identified herself as one of the intervenors in the case. Foster Mother and her husband had previously adopted two of Mother's children. They were also the temporary caregivers for Evelyn and wanted to adopt her if the court terminated the parents' rights. Foster Mother believed that allowing her and her husband to adopt Evelyn was in Evelyn's best interest. According to Foster Mother, Evelyn is doing well living with her two brothers. Evelyn runs, plays, and has bonded with them. Foster Mother originally met Mother through Catholic Charities when Mother was looking for a placement for her son. Foster Mother testified that there are concerns Evelyn may be autistic because of her behavior. According to Foster Mother, Evelyn's life is very routine and structured, and when you depart from that normal routine and structure she has massive tantrums, more than a normal two-year-old child should have. Foster Mother also testified that when Evelyn first came into her care, she had to be taught how to eat table food because she would only eat baby food from pouches.

### 7. Evelyn's Maternal Grandmother

The next witness was Evelyn's maternal grandmother. Maternal Grandmother testified that she went with Mother on eight to ten of Mother's visits with Evelyn at the Department. According to Maternal Grandmother, Mother would bring food, clothes, toys, and snacks for Evelyn. During the visits, Mother would interact with Evelyn by playing with her, playing music for her, and reading to her.

Maternal Grandmother testified that Evelyn seemed very happy to be with Mother. In Maternal Grandmother's opinion, Mother and Evelyn had a bond. Maternal Grandmother testified that she was unaware of the reason why Mother's visits with Evelyn were terminated because she had stepped out of the room for a phone call when the incident sparking the termination occurred.

## C. Trial Court's Findings

The trial court found by clear and convincing evidence that Mother had her parent-child relationship with another child terminated based on a finding that Mother's conduct was in violation of section 161.001(b)(1)(D) or (E) of the Family Code. Based on that finding, the court ordered Mother's parent-child relationship with Evelyn terminated pursuant to section 161.001(b)(1)(M) of the Family Code. The trial court also terminated Father's parent-child relationship with Evelyn pursuant to section 161.001(b)(1) of the Family Code, subsections D, E, and F. The court additionally found by clear and convincing evidence that termination of Mother's and Father's parental rights was in Evelyn's best interest. The trial court appointed the Department to be Evelyn's sole managing conservator. Only Mother has appealed the trial court's judgment.

## ANALYSIS

Parental rights can be terminated upon clear and convincing evidence that (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2) (West Supp. 2017); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Only one predicate finding under section 161.001(b)(1) is necessary to support a decree of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Mother raises a single issue on appeal, in which she challenges the factual sufficiency of the

10

evidence supporting the trial court's finding that termination of Mother's parental rights was in Evelyn's best interest.

## I. Burden of proof and standard of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re S.R.*, 452 S.W.3d 351, 357 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to clear and convincing evidence. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *accord J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *S.R.*, 452 S.W.3d at 358.

In reviewing the factual sufficiency of the evidence, we consider all of the evidence, including disputed or conflicting evidence. *J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In*

11

*re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We cannot "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## II.     Best Interest

Mother's single issue on appeal challenges the factual sufficiency of the evidence supporting the trial court's finding that termination of her parental rights is in Evelyn's best interest.

### A.     Legal Standards

Termination must be in the child's best interest. Tex. Fam. Code § 161.001(b)(2). Texas courts presume keeping a child with the child's natural parent serves the child's best interest. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.— Houston [14th Dist.] 2003, pet. denied). The Department carries the burden of rebutting that presumption. *Id.* Prompt, permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014).

Courts may consider the following non-exclusive factors, known as the *Holley* factors, in reviewing the sufficiency of the evidence to support the best-interest finding: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate

the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). As noted, this list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The Family Code also sets out factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *See* Tex. Fam. Code § 263.307(b). Finally, proof of acts or omissions under section 161.001(b)(1) affect the child's best interest. *See In re S.R.*, 452 S.W.3d at 366.

## B. Application

### 1. Evelyn's needs and desires

When a child is too young to express her desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.–Houston [14th Dist.] 2014, no pet.). At the time of trial, Evelyn was two and a half years old and had lived with her foster parents for a significant portion of her life. Evelyn's foster parents had previously adopted two of Mother's children, and Foster Mother reported that Evelyn enjoyed being with her siblings and had bonded with them. Foster Mother testified that Evelyn is developmentally delayed, has vision issues, and may be autistic. Foster Mother testified, however, that Evelyn has made progress in their care. For example, Evelyn has learned to eat table food and no longer eats only baby food out of pouches. Foster Mother testified that they have spent everything needed to take care of Evelyn and have not received any assistance from anyone to help with those expenses. Foster Mother testified that they are

willing to continue doing so. Foster Mother also testified that she and her husband wished to adopt Evelyn.

The record evidence indicates that the foster parents were meeting Evelyn's present emotional and physical needs and that there was presently no physical or emotional danger to her. Additionally, as the fact finder, the trial court could reasonably have concluded based on this evidence that Evelyn's foster parents would continue meet her needs in the future.

### 2. Mother

The evidence of Mother's actions that endangered Evelyn, summarized above, is important to the best-interest analysis. *See S.R.*, 452 S.W.3d at 366. The evidence further shows that Mother had recently been abducted by the father of one of her older children, held for two days, and beaten badly. This evidence casts doubt on the safety of the living environment Mother would provide Evelyn. Mother displayed a reluctance to take responsibility for the events that have happened in her life, which casts doubt on her future ability to adjust her behavior to avoid similar events in the future.

At the time of trial, Mother testified that she had maintained a stable residence for a year. But Smith, the conservatorship caseworker, testified that she was unaware of Mother's residence. The trial court, as the trier of fact, could reasonably have disbelieved Mother's testimony and believed Smith's. Mother also testified that she was self-employed painting walls and cleaning houses. Mother provided no further evidence verifying her employment or income. Based on evidence that Mother had relied on E.N. to provide for both her and Evelyn, the trial court, as the trier of fact, could reasonably have concluded that Mother did not have the financial ability to provide for Evelyn's health and welfare.

14

Although Mother had completed many parts of her service plan, Smith testified that Mother had not participated consistently in random drug screening. In addition, Mother tested positive for cocaine on one occasion. *See J.O.A.*, 283 S.W.3d at 345 (stating that a parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being).

Based on the evidence summarized above, the trial court also could reasonably have decided that Mother did not recognize Evelyn's significant medical and developmental issues. The same evidence also establishes that Mother does not have the ability or interest to provide Evelyn the level of care she would need even if she did recognize the existence of her vision condition and her developmental delays, possibly including autism. *See In re J.E.M.M.*, 532 S.W.3d 874, 888 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("As autism cases show, bringing up a child with this challenging disorder can be difficult even for two parents equipped with resources and working together to support the autistic child."); *In re S.P.*, 509 S.W.3d 552, 558 (Tex. App.—El Paso 2016, no pet.) (evidence of parent's past neglect or inability to care for child is relevant to best-interest analysis).

### 3. Conclusion on best interest

Considering the entire record, we conclude the evidence the trial court could not reasonably have credited in favor of termination is not so significant as to prevent the court from reasonably forming a firm belief or conviction that termination of Mother's rights was in Evelyn's best interest. Accordingly, the evidence is factually sufficient to support the trial court's best-interest finding. We overrule Mother's sole issue on appeal.

## CONCLUSION

We affirm the trial court's judgment.

/s/    J. Brett Busby
          Justice

Panel consists of Justices Busby, Brown, and Wise.