**Fourth Court of Appeals**
San Antonio, Texas


## DISSENTING OPINION

No. 04-17-00666-CV

**IN THE INTEREST OF R.M.P.** and J.A.P., Jr., Children

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2016-PA-00286
Honorable John D. Gabriel, Jr., Judge Presiding

Opinion by:       Sandee Bryan Marion, Chief Justice
Dissenting Opinion by: Rebeca C. Martinez, Justice

Sitting:          Sandee Bryan Marion, Chief Justice
                  Rebeca C. Martinez, Justice
                  Irene Rios, Justice

Delivered and Filed:  June 13, 2018

Because I believe the Department failed to meet its burden of proving by clear and convincing evidence that termination of Appellant's parental rights was in the best interest of the children, I respectfully dissent.

### EVIDENCE AT TRIAL

I believe a thorough review of the evidence presented at trial is necessary to analyze the best interest issue and to determine whether the Department met its requisite burden.

*Removing Caseworker*

Bianca Martinez, an investigator for the Department, testified that on February 4, 2016, she investigated an allegation that the children did not have appropriate supervision. She testified

Appellant, their father, had been arrested[1] at his home at about 3:45 p.m. and there was no other caregiver at the house to wait for the children to get off the school bus. Martinez spoke to Appellant at the Bexar County Central Magistrate's Office and asked him if there were other relatives who could help with the children. Appellant did not know the whereabouts of his ex-wife and the mother of his children, Roseanna. He told Martinez Roseanna was a drug addict and that she was not involved with the children. Appellant told Martinez the children suffered from seizures and required medication. He gave Martinez the keys to his house so that the medication could be obtained. When Martinez arrived at the home, it appeared to have been broken into. Roseanna was in the house. She refused to speak to Martinez and appeared to be intoxicated and was very aggressive. Appellant was released from custody the same day and immediately picked up the children. He agreed to not take the children home since Roseanna was there. The next day, Martinez returned to the house to meet with Appellant. She observed Roseanna in front of the house, yelling and screaming and throwing items at Appellant and Ruth. Appellant was cooperative and answered Martinez's questions. Appellant reiterated that Roseanna did not live in the home, but the children told Martinez that Roseanna did live there and some of her belongings were in the home. Martinez spoke to Ruth individually. Ruth told Martinez that her father tried to touch her and according to Martinez she "made a statement involving rape." Ruth also said she had been touched inappropriately by a neighbor. At that time, Martinez obtained "exigent removal" of the children due to Ruth's allegation against her father.

Martinez testified the Department has been involved with the family since 2008, and twice offered family-based services, but did not find cause to remove the children.

---

[1] Appellant testified the charge was dismissed and there is nothing in the record to show he has any charges pending. Appellant further stated he was "falsely arrested" because the authorities were looking for another man by the same name. The Department offered no evidence regarding Appellant's arrest or criminal record, if any.

*Father*

Appellant testified he has taken care of Ruth and John by himself since they were born. Ruth started having "light seizures" when she was three or four years old. John also has "light seizures" and has been diagnosed as autistic. Appellant has always taken the children to doctor's appointments and followed the doctors' directions regarding administration of medication. Ruth is in special education classes; Appellant was not sure why the school put her in special education classes. Appellant raised five other children by himself; they are now grown. He denied using drugs or alcohol. He stated that Roseanna has not been very involved with the family since their divorce. She sees the kids once or twice a year, and Appellant does not allow her to visit if she is "behaving bad." He admitted that he allowed Roseanna to stay at his house one week after she had surgery because she did not have anywhere else to go. He occasionally gives her a ride when she needs one. While the children were in the Department's care, he once took Roseanna on a visit with John. Appellant testified the Department did not inform him that the children were not permitted to have contact with Roseanna while in the Department's care.[2]

On three to four occasions, Ruth claimed she was assaulted by other men. Each time, Appellant took her to the hospital to be examined. No physical evidence of abuse was detected. In 2008, when Ruth was about five years old, she was taken from Appellant's fenced-in yard by a "guy" or a neighbor in a van while Appellant was at the store and Roseanna was watching the children. Appellant called the police and Ruth could not be found for two or three hours. In 2009, the Department investigated an allegation that Appellant left Ruth unsupervised for an extended period of time. In 2015, Appellant took Ruth to the hospital because he was informed that someone had assaulted Ruth. Again, no physical evidence of abuse was revealed. Appellant was unaware

---

[2] The record is void of evidence that Appellant was ordered to avoid contact with the children's mother.

of the medical diagnoses made while the children were in the Department's care; he stated he had not spoken with the children's current physicians.

Appellant stated he believed Ruth falsely accused him of sexual abuse to get back at him for trying to discipline her. He explained that he had threatened to call the Department when Ruth was not behaving and that Ruth told Appellant that if he did, she would say that he had abused her. Appellant testified he is not under a criminal investigation and has not been contacted by law enforcement regarding the allegations made by Ruth.

Appellant was concerned about the children's placements by the Department after they were removed from his care. According to Appellant, Ruth is not in good health, her hair is messy and she has broken teeth. John gained a lot of weight while in the Department's care, which made it hard for him to breathe, and also has broken teeth. Appellant did not believe the residential treatment center was a good environment for a child.

Appellant stated he is in good health and does not use drugs; he last drank alcohol 40 years ago. He is retired and receives a pension. The children each receive approximately $1,000 per month from Appellant's Social Security. Appellant stated he did not need that money for living expenses because he received his own check. After the children were removed, Appellant was forced to move to a trailer home because he could no longer afford rent for the house where he and the children were living. If the children are returned to him, he plans to move to Bakersfield, California where he has numerous cousins. He planned to stay at his cousin's house until he could find a house to rent.

### Child's Counselor

LaDonna Harris, Ruth's counselor, testified she sees Ruth weekly, and sometimes twice a week, for counseling. Harris diagnosed Ruth with post-traumatic stress disorder, including

depression and anxiety; depressive disorder with psychotic features; intellectual disability; and bipolar disorder. Ruth takes medication for these disorders that was prescribed by her psychiatrist but is still having problems. Harris explained that Ruth has the maturity of a seven-year-old. Harris was not certain, but she believed Ruth had an IQ of 60. Ruth does not understand that strangers can be dangerous and often engages in attention-seeking behavior. Because of this, Ruth needs to be constantly supervised.

Ruth has only had one visit with her father since she was removed from the home. She has been able to talk to her father on the phone. Harris noticed that after a phone call with her father, Ruth would start urinating on herself. When Harris asked Ruth why that happened, she said she was nervous, or just forgot to go to the restroom. Ruth also told Harris "that she was scared because she had said so many bad things that her dad did that wasn't true." Harris noted that Ruth also urinates on herself at other times not related to phone calls with her father. But Harris clarified that the first time she noticed the urination was after Ruth received a phone call from her father.

When asked if Ruth suffers seizures, Harris stated, "Ruth tells me that she fakes the seizures for attention." Harris has asked Ruth what her fake seizures look like, and Ruth will demonstrate on the spot, "fluttering her eyes and dazing off." "And she'll say, 'Just like this, Ms. Harris.'" Harris was then asked, "has [Ruth] indicated that she has faked or made up or lied about anything else?" Harris answered, "she said that she lied about her dad touching her. And she said it wasn't true. She was mad at him." Harris stated that in her opinion, Ruth "has not experienced sexual abuse."

Harris opined that Ruth needs to have more visits with her father. Ruth told Harris she wants to go home with her brother. In Harris's opinion, Ruth is not ready to go home. Harris

could not answer whether it was in Ruth's best interest to have her father's parental rights terminated because "I don't know anything about the dad."

### Father's Counselor

Victoria Caylor, a mental health counselor, testified that Appellant was referred to her for individual therapy. Caylor is a Licensed Sex Offender Treatment Provider who offers counseling to both victims and sex offenders. Caylor stated Appellant denied assaulting his daughter and said that Ruth fabricated the story because she was mad at him because he would not allow her to see her mother. Caylor discharged Appellant after nine sessions because she did not think he was making any progress because he was in constant denial of the sexual assault allegation. Caylor could not answer whether Appellant would be able to successfully and efficiently parent his children because she had never seen him with his children.

### Department Caseworker

There was only one caseworker, Jennifer Munoz, assigned to the family for the entire 18-month pendency of the case. Munoz testified that Ruth is currently 13 years old and placed in a foster home in Killeen, Texas. The Department had only allowed Ruth to visit Appellant once during the 18 months prior to trial. John is nine years old and is currently living in a residential treatment center in Spring, Texas. She explained that a residential treatment center is a facility where children with special needs who are on psychotropic medications are sent. Since his removal, John has been in five placements in five cities, including a psychiatric hospital. John showed a lot of aggression, including hitting other students and destroying property. John was taking medication for seizures, ADHD, and autism at the time of removal. He is now on more medication and has recently shown vast improvement in his behavior. At the time John was brought into care, he was having trouble in school, including hitting others and throwing items.

He was hospitalized at Clarity [Child] Guidance Center in 2014. Munoz stated that John would react aggressively when told, "no." Ruth's issues in school were related to her "pseudo seizures" and trouble focusing and concentrating. The school believed Ruth would benefit from counseling, but to Munoz's knowledge, Appellant did not engage a counselor for Ruth.

Appellant visited his son monthly, often traveling hours to see John for a visit lasting only 30 minutes or one hour. Appellant only missed one visit, when he experienced car trouble. Munoz stated the visits between Appellant and his son went well and there were no concerns. The caseworker testified that the Department's plan was for both Ruth and John to be adopted by Ruth's current foster mother. The current placement would like to keep the children long term but had "not indicated a willingness to adopt the children." John had not lived with a family since removal, and it was unknown how he would adjust once placed in the foster home with Ruth. The Department initially attempted to place John in the Killeen foster home, but he was removed after one day because of his aggressive behavior.

While in the Department's care, the children experienced health problems. John gained a lot of weight because he was overmedicated and the Department did not reassess his medical plan until ordered to do so by the trial court.[3] Ruth exhibited self-harming behaviors such as cutting herself. She also picked her nails and toenails to the point of bleeding. While in the Department's care, Ruth made an outcry of sexual abuse against a boy at the YMCA, but it was "ruled out." Both children would urinate on themselves at random times.

A family service plan was created for Appellant. The goals of the service plan were for Appellant to learn to use appropriate parenting practices and to meet the special needs of his children. He was also to demonstrate the ability to provide the children a home free of abuse and

---

[3] The Honorable Associate Judge Richard Garcia, presiding judge of Bexar County Children's Court, oversaw the case and ordered the medical review.

neglect and show future concern for their safety. According to Munoz, the Department did not ask Appellant to admit to the allegations made by Ruth but expected him to "process that information." Munoz opined that although Appellant did complete all services, he did not meet the goal of "process[ing] that information" and thus the Department alleged Appellant did not complete his family service plan. He was unsuccessfully discharged from individual counseling by three therapists, including Caylor. He attended all required therapy sessions but continued to deny the allegations against him and was angry with the Department for taking his children away. He also successfully completed two parenting courses, including a course on children with mental health needs, and submitted to random drug tests, all of which were negative. Munoz stated Appellant "was not able to verbalize what he learned" in the parenting courses. The caseworker had not visited Appellant's home since removal. She tried to schedule one visit but the date was not amenable to her. Munoz acknowledged that Appellant was present at every court hearing.

Munoz believed Appellant's parental rights should be terminated because, in her opinion, he has no knowledge of the mental health needs of the children; he lacks the knowledge of how to properly care for the children; he has not demonstrated that he is able to meet the children's special needs; and he was discharged from three different professional counselors because he did not want to address the reason why the children were removed. Munoz stated, "I believe it would pose a threat to [Ruth] and [John] if they were placed with [Appellant.]" She stated there were several instances in the past where Appellant was not supervising Ruth, which caused Ruth to engage in "these alleged sexual behaviors with other individuals." She continued, "there's no doubt that [Appellant] does love his children and the children love him, but it's not in their best interest to be placed with [Appellant]." When asked if her opinion had "something to do with" Appellant's age of 77, Munoz answered, "that can play a factor."

On cross-examination, Munoz elaborated on her opinion that Appellant's parental rights should be terminated. She agreed that inadequate supervision had been an ongoing issue with the family since 2008 and that Appellant believes his children are normal and do not require constant supervision. Munoz believed that Roseanna was a danger to the children and that Appellant allowed Roseanna to have contact with the children during the pendency of the case.[4] She stated that in a few instances Roseanna was participating in the phone contact between Appellant and Ruth. She did not provide details, but merely stated "those phone contacts were very inappropriate." Roseanna also accompanied Appellant on a visit to John in Spring, Texas. Munoz believed Appellant did not understand that the children should not be around Roseanna. She did not believe Appellant had demonstrated that he could protect the children from future abuse or neglect. She agreed that Appellant lacks a supportive network. The Department was unable to find any of Appellant's relatives who could help with the children. Munoz was surprised by Appellant's testimony that he planned to take the children to California if they were returned to him. Appellant had never provided any information on relatives in California to the Department. Munoz agreed that Appellant did not understand the nature of the conduct that placed his children in harm's way and had not met the goals of his service plan.

When asked about the children's desires, Munoz testified that John told her he wanted to live with his sister and that his visits with his father go well. Ruth went back and forth as to whether she wanted to visit with her father. Ruth told Munoz she wants to be with her brother. Ruth said she loves to live with her foster mom, but Munoz also agreed Ruth was easily influenced by "whoever's paying attention to her at that time period." Munoz did not believe Ruth had the

---

[4] Appellant's service plan does not include a provision prohibiting the children to have contact with Roseanna.

capacity to decide what was in her best interest. Munoz agreed that the children's mother was not currently a danger to the children since she was incarcerated and in failing health.

### Children's Pediatrician Prior to Removal

Dr. Rebecca Houston is a pediatrician who saw each child on seven to eight occasions between March 2014 and December 2015 prior to their removal by the Department. Dr. Houston testified she never felt the need to contact the Department regarding the children's welfare. The children were well-kept and appeared to be sanitary. Dr. Houston treated John for significant behavioral issues related to his autism and ADHD; she also addressed healthy eating due to his obesity. She prescribed a medication for John's autism and consulted with a neurologist on Ruth's seizures. Dr. Houston also consulted with a psychologist regarding Ruth's pseudo-seizure disorder. Dr. Houston believed Appellant was following her recommendations regarding administration of the medication. When Dr. Houston recommended speech therapy for John, Appellant was initially hesitant, but did decide to proceed with the therapy. Appellant regularly maintained the children's doctor visits and accompanied them to every visit. Dr. Houston agreed that she would describe the children's relationship with their father as caring and loving; she was never concerned about their interactions. It appeared to Dr. Houston that the children's medical needs were being taken care of by Appellant. She believed Appellant recognized his children had special needs and that he was addressing those needs as best he could.

### Children's Neurologist Prior to Removal

Dr. August Saravia is a pediatric neurologist. He testified that he saw the children on almost 40 occasions prior to their removal by the Department. He first saw Ruth for seizures in July 2007, when she was four years old. In 2014, she was also diagnosed with pseudo-seizures. Dr. Saravia prescribed multiple seizure medications to Ruth. Ruth was accompanied by her father

to the visits.  Dr. Saravia never saw anything during the visits that would have caused him to call the Department.  Appellant did not miss any appointments with Dr. Saravia and followed his treatment recommendations.  He believed Appellant was aware of and dealing with Ruth's medical needs; he was unable to say whether Appellant was aware that Ruth had "special needs."  Dr. Saravia also treated John in 2015 and prescribed medication which can have behavioral side effects, including aggression.

## ANALYSIS

A trial court may order termination of the parent-child relationship only if the court finds by clear and convincing evidence one or more statutory ground for termination and that termination is in the children's best interest.  TEX. FAM. CODE ANN. §§ 161.001(b)(1), (2); 161.206(a) (West Supp. 2017).  There is a strong presumption that keeping a child with a natural parent is in the child's best interest.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re G.M.*, 596 S.W.2d 846, 846-47 (Tex. 1980). "Termination of parental rights is serious business. The law requires clear and convincing evidence to sever the relationship between a parent and child and due process demands that the State document a sufficient measure of evidence in the record to support that outcome."  *In re J.E.M.M*, 532 S.W.3d 874, 891 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

In reviewing the legal sufficiency of the evidence to support the termination of parental rights, the court must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."  *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so."  *In re J.F.C.*, 96 S.W.3d at 266.  "A

corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*

In determining whether the evidence in this case would permit a reasonable factfinder to form a firm belief or conviction that termination of Appellant's parental rights was in the children's best interest, we consider the nonexclusive *Holley* factors. These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013). The Department was not required to prove all of these factors, and the absence of evidence about some factors would not preclude the factfinder from reasonably forming a strong conviction that termination is in the children's best interest, particularly if the evidence was undisputed that the parental relationship endangered the safety of the child. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "Some cases, however, will present complex facts in which 'paltry evidence' relevant to each *Holley* factor would not suffice to uphold a factfinding that termination is required." *In re B.D.A.*, --- S.W.3d ---, No. 01-17-00065-CV, 2018 WL 761313, at *14 (Tex. App.—Houston [1st Dist.] Feb. 8, 2018, no pet. h.) (Massengale, J., dissenting on reh'g) (citing *In re C.H.*, 89 S.W.3d at 27).

### *Desires of the Children*

At the time of trial, Ruth was thirteen years old and John was nine. Neither child testified, and according to the Department and the ad litem, Ruth was not competent to testify. The evidence showed the children wanted to be with each other at all costs, whether that meant returning to Appellant or staying in the Killeen foster home. But the Department could not guarantee that both children would be adopted by the Killeen foster parent. The caseworker stated the children loved their father and Ruth's counselor stated she loved her father and needed family. I would conclude this factor is neutral, weighing neither in favor of nor against termination of parental rights.

### *Children's present and future emotional and physical needs and any present or future emotional and physical dangers*

It was undisputed that both children suffer from physical and psychological disorders. Both children have seizures; Ruth has a low IQ and many psychological conditions; John has autism and behavioral challenges. Although the Department argued Appellant failed to recognize that his children had "special needs," two of the children's physicians testified that Appellant sought medical treatment for the children and followed doctors' orders as far as medicating the children and attending appointments for a significant period of time prior to removal. The caseworker testified that on the day the children were removed, Appellant alerted the Department his children needed their medications and allowed them to enter his house to retrieve the medications.

With regard to present and future emotional and physical danger to the children, the jury heard evidence that Appellant once left the children with Roseanna and during that time, Ruth was temporarily abducted. In addition, even though she later recanted, the jury was also presented with evidence that Ruth had alleged Appellant assaulted her. Ruth's counselor did not believe Ruth had been sexually assaulted, and first noticed Ruth would urinate on herself after a phone call from

her father, although she also noted Ruth did so at other unrelated times. According to Ruth, she did so because she was nervous or just forgot to go to the restroom. John also urinated on himself but there was also no evidence as to the cause. The Department presented evidence that it had been involved with the family since 2008 due to concerns that Appellant did not know how to "manage" his children, but the only allegation termed "reason to believe" was that Appellant's home was unsanitary. Nonetheless, the Department presented no evidence at trial about the condition of Appellant's home and no caseworker visited the home during the pendency of the case. The Department generally alluded to Appellant being unable to handle John's outbursts but did not elaborate further. Neither Ruth's counselor nor Appellant's counselors offered evidence of best interest since no one observed the children with Appellant. It was undisputed that Appellant had sought treatment for the children's physical and mental health needs since at least July 2007 when Ruth was first treated as a four year old. Given the paucity of evidence demonstrating that conduct by Appellant would endanger the children, I would conclude this factor weighs against termination of parental rights.

***Parental abilities of the individuals seeking custody***

The Department hoped that both children would be adopted by Ruth's foster mother but admitted that the foster mother had not yet agreed to adopt either child. Ruth's foster mother did not testify and there was no testimony regarding her parenting abilities. Appellant testified that he had cared for the children since they were infants and would continue to do so. He completed parenting courses, including a course for special needs children. Evidence was presented from Drs. Houston and Saravia that Appellant had and was able to take care of the children's medical and psychological needs and that there was no cause for concern regarding Appellant's relationship

with his children. By all accounts, Appellant's visits with John were proper. This factor also weighs against termination of parental rights.

***Programs available to assist the individuals seeking custody to promote the child's best interest***

It is undisputed that Appellant completed the requirements of his service plan, but the Department claimed he was just going through the motions and did not "verbalize what he learned" in the parenting courses and did not "process" the reasons for the Department's involvement in individual therapy. Appellant testified that he refused to admit he assaulted Ruth. Ruth's therapist testified that more visits between Ruth and her father would have been beneficial; however, the Department did not allow for that to occur. Given the caseworker's conclusory testimony, I believe this factor also weighs against termination of parental rights.

***Plans for children by those seeking custody / Stability of home or proposed placement***

Again, the Department hoped that both children would be adopted by Ruth's foster mother but admitted that the foster mother had not yet agreed to adopt either child. John had been housed in a residential treatment center since he was removed from Appellant's care, and there was no testimony regarding the likelihood of him being adopted. Appellant testified he planned to take the children to California where he has relatives to help him. Given the lack of evidence demonstrating the children's interests will be better served outside the family home, this factor weighs against termination of parental rights.

***Summation***

Reviewing the record in the light most favorable to the jury's findings, I would conclude the Department failed to meet its burden to establish by clear and convincing evidence that termination of Appellant's parental rights is in the children's best interest. The record contains undisputed evidence that Appellant completed his service plan, was drug-free, and maintained

contact with the children, even traveling for hours to visit John. He visited Ruth on the one occasion allowed him by the Department. Although the Department claimed Appellant's failure to "process" the reasons for the removal of his children meant that he did not meet the goals of his service plan, I do not believe that such conclusory testimony from the caseworker amounts to clear and convincing evidence of failure to complete a service plan. *See In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) ("conclusory testimony, such as the caseworker's, even if uncontradicted does not amount to more than a scintilla of evidence").

The majority states that Appellant "failed to demonstrate he understood the children's special needs and was not able to verbalize what he learned in parenting classes." It was not, however, Appellant's burden to prove anything at trial; to the contrary, the burden remained with the Department to show by clear and convincing evidence that placing the children with Appellant would harm or endanger them. *See In re E.N.C.*, 384 S.W.3d at 808 (a lack of evidence contradicting a finding does not constitute evidence supporting the finding).

The evidence at trial did not conclusively establish actual emotional or physical danger to the children, or that the parent-child relationship was improper. In fact, because the Department did not allow Ruth to have but one visit with Appellant during the 18 months she was in the Department's care, there was little evidence about Ruth's relationship with or interactions with her father. Ruth's counselor could not say whether it was in her best interest to terminate Appellant's parental rights because she had not been able to see Ruth interact with her father. The counselor recommended that Ruth be permitted to have more visits with her father, but it does not appear that the Department made reasonable efforts to facilitate the parent-child relationship.[5] Again, at no time did the Department visit Appellant's home after the children were removed.

---

[5] There is a strong presumption that a child's best interests are served by maintaining the parent-child relationship. *See In re G.M.*, 596 S.W.2d 846, 846-47 (Tex. 1980).

In addition, it appears that the Department held Appellant responsible for the shortcomings of his ex-wife. Almost all the exhibits proffered by the Department and admitted at trial pertained to Roseanna's criminal history. In addition, many of the Department's prior interventions with the family were precipitated by Roseanna's actions or inactions; the other interventions were ruled out due to cooperation by Appellant. In May 2008, Ruth was wandering around unsupervised and was picked up by two teenagers when "[t]he mother was supposed to [be] watching the child." In June 2008, family-based services were offered for two months but the case was closed because Appellant "was able to provide his children with their medical and basic needs." In 2009, a report was made regarding neglectful supervision of Ruth, but the case was ruled out and closed. A January 2014 complaint regarding Ruth's acting out and seizure disorder was ruled out after Dr. Saravia confirmed that Appellant made the effort to secure a psychologist for Ruth; Dr. Saravia also confirmed there were no concerns and that Appellant has shown up to all appointments and gave Ruth her medication regularly. A March 2014 complaint regarding John was ruled out after it was recognized that John suffers from a behavior issue linked to cognitive processing. Appellant let John "ride out" his tantrums and did not use physical discipline. A 2015 complaint regarding unsanitary living conditions in the home was substantiated. The Department repeatedly criticized Appellant for allowing Roseanna to participate in telephone conversations with the children or for allowing her to accompany him on a visit with John. Appellant's service plan, however, contains no provision prohibiting Roseanna to have contact with the children. In any event, the Department's fears of Roseanna spending time with the children are unfounded because she is incarcerated and terminally ill. In sum, it appears that Appellant is parenting two children with a host of health and behavioral problems. This would be a challenging task for any parent, let alone a single parent.

Most troubling of all is that the Department did not establish that it has a permanency plan in place for the children. "It was the Department's burden to prove by clear-and-convincing evidence that termination of the father's rights was in the children's best interests, but it 'offered no evidence regarding its plan for placement of the children,' suggesting 'it is as likely as not that the children will remain in long-term foster care or even be separated' if their father's rights are terminated." *In re B.D.A.*, 2018 WL 761313, at *14 (Massengale, J., dissenting on reh'g) (quoting *Horvatich v. Tex. Dep't of Protective & Regulatory Srvcs.*, 78 S.W.3d 594, 602 (Tex. App.—Austin 2002, no pet.)); *see also In re A.J.L.*, No. 04-14-00013-CV, 2014 WL 4723129, at *1-5 (Tex. App.—San Antonio Sept. 24, 2014, no pet.) (mem. op.) (reversing on best interest where Department admitted it had no definitive placement plans for the children); *In re D.M.*, No. 04-14-00858-CV, 2015 WL 3398379, at *5 (Tex. App.—San Antonio May 27, 2015, no pet.) (mem. op.) (same). Ruth's foster mother did not testify, and John had spent the entirety of the case living in a psychiatric hospital and various residential treatment centers. The siblings desperately want to be together, but the Department was unable to establish that such an outcome will occur.

## CONCLUSION

Given that most of the *Holley* factors weigh in Appellant's favor, I would conclude the evidence presented at trial was insufficient to support the jury's best interest findings. "The law sets a high evidentiary bar for termination of parental rights. We do not alleviate the plight of Texas foster children by lowering that bar and perpetuating diminished judicial expectations of the proof that must be presented by the Department." *In re B.D.A.*, 2018 WL 761313, at *14 (Massengale, J., dissenting on reh'g). Accordingly, I would reverse the judgment of the trial court and remand for further proceedings.

Rebeca C. Martinez, Justice