

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-19-00227-CV

**IN THE INTEREST OF M.I.A.**, a Minor Child

From the 166th Judicial District Court, Bexar County, Texas
Trial Court No. 2017-PA-02030
Honorable Cynthia Marie Chapa, Judge Presiding

Opinion by:　Beth Watkins, Justice

Sitting:　Rebeca C. Martinez, Justice
Luz Elena D. Chapa, Justice
Beth Watkins, Justice

Delivered and Filed: October 9, 2019

AFFIRMED

Appellant M.I.A., a minor child acting through his attorney and guardian ad litem, appeals the portions of the trial court's order: (a) denying the petition filed by the Texas Department of Family and Protective Services ("the Department") to terminate the parental rights of M.I.A.'s biological father, appellee M.A.O. ("Father"); and (b) awarding visitation to M.I.A.'s paternal grandmother O.O. ("Grandmother"). We affirm the trial court's order.

### BACKGROUND

In August of 2014, Father started a long-distance relationship with M.I.A.'s biological mother, Y.A. ("Mother"). Although they lived in different cities, Father sent Mother money and did "as much as he [could]" to help her provide for her two children from prior relationships, E.L. and I.C. During their six-month relationship, Mother became pregnant with M.I.A. When Mother

told Father she was pregnant, he told her he wanted to be part of the child's life and asked her to contact him if she needed anything. During her pregnancy, Mother began dating another man, Marcos. Father did not send Mother money or other support during her pregnancy because she told him "that she had someone in her life and she didn't want [Father] in it."

A few weeks after M.I.A. was born, Father wanted to meet his son, but Mother refused to arrange a visit because of her relationship with Marcos. Mother did not ask Father to send financial support for M.I.A. because "having a relationship with Marcos, [she] thought that everything was going to be okay and [she] didn't need anyone else's help." She also testified that she was afraid to put Father's name on M.I.A.'s birth certificate, get in touch with him, or ask him for money because Marcos was possessive of her and abused her. As a result, M.I.A., who was three years old at the time of trial, has never met Father. While Mother testified that the lack of contact between Father and M.I.A. was her decision, she also stated that she believed Father could be a good parent to M.I.A.

Mother and Marcos later had a child, A.R., and in August of 2016, Child Protective Services ("CPS") received a referral of possible physical abuse of A.R. During that investigation, CPS discovered that Mother, Marcos, E.L., I.C., M.I.A., and A.R. were living in a dirty, mildewed room that did not have adequate sleeping arrangements for the children. CPS received a second referral in August of 2017, when Mother gave birth to a fifth child, O.R., who was born brain dead. When O.R. was released from the hospital, CPS removed her from Mother and Marcos's custody based on concerns that their home was unsafe for her and they could not handle her complex medical needs.

CPS tried to help Mother and Marcos obtain services that would allow them to retain custody of Mother's four other children, including M.I.A. Those attempts failed, and CPS

eventually removed all the children and placed them in foster homes.[1] It is undisputed that Father did not do anything that contributed to the children's removal from Mother and Marcos's home.

The CPS caseworker who removed the children searched child support and criminal records for M.I.A.'s father, but she did not find Father because Mother had provided Father's nickname instead of his legal name. On September 7, 2017, the Department filed a petition to terminate the rights of all five children's biological parents, and the petition identified Father by the nickname Mother had given the caseworker. In March of 2018, after the Department was appointed temporary managing conservator of the children, the CPS caseworker who was assigned to the matter found Father on Facebook. At that time, Father was incarcerated.

When Father was released on probation in May of 2018, he contacted the caseworker and attended at least one court hearing regarding the children. In June of 2018, the caseworker showed Father a service plan that ordered him to contact a therapist, undergo a psychosocial evaluation and random drug testing, and take a parenting class. Father signed the service plan, but he testified that it was not explained to him at that time and he did not receive a copy of it until the day he testified at trial. The caseworker testified that she explained the service plan's requirements to Father and he did not satisfy them. She also testified that she did not set up any services for him because he was about to go back to jail. Nevertheless, she agreed that he made attempts to "meet the spirit" of what she told him to do.

Father went back to jail in July of 2018. Between his release in May and his re-incarceration in July, he did not seek the court's permission to have visits with M.I.A., but he called the caseworker to ask how M.I.A. was doing, and he underwent a DNA test so he could be adjudicated as M.I.A.'s father. He also asked the caseworker to consider Grandmother as a possible placement

---

[1] Because O.R. had complex medical needs, she was placed in a foster home for medically fragile children instead of with her four siblings. O.R. passed away before trial.

for M.I.A. CPS did not perform a case study on Grandmother because "she did not want to have all four children placed with her."

The parties tried the Department's termination petition in a three-day bench trial. Both I.C.'s father and Marcos voluntarily relinquished their parental rights, and E.L.'s father was unknown, so the trial focused primarily on the Department's allegations against Mother and Father. The trial court heard testimony from the CPS caseworkers, one of E.L.'s teachers, a previous foster parent for I.C. and M.I.A., the children's current foster father, the assigned CASA volunteer, Mother, and Father. After the parties rested, the trial court orally rendered judgment terminating the parental rights of Mother, Marcos, I.C.'s father, and E.L.'s unknown father; denying the Department's petition to terminate Father's rights; appointing the Department as M.I.A.'s permanent managing conservator and Father as M.I.A.'s possessory conservator; and ordering visitation with M.I.A. for Grandmother. The final order specifies that the trial court found appointing Father possessory conservator was in M.I.A.'s best interest, and it grants Father "possession and access . . . as provided by this order." Attachment A to the final order specifies that Father's visits with M.I.A. will not begin until Father is released from jail, that those visits will be supervised by a therapist, and that they are "contingent on therapist availability and recommendation." The order also specifies that Grandmother's visits with M.I.A. will be supervised by a therapist and will take place in M.I.A.'s hometown, San Antonio.

M.I.A., acting through his attorney and guardian ad litem, appealed the denial of the Department's petition to terminate Father's parental rights and the order granting visitation to Grandmother. Although the Department did not file a notice of appeal, it filed a brief in support of M.I.A.'s appeal.

## ANALYSIS

### *Father's Parental Rights*

M.I.A. argues that the trial court abused its discretion by refusing to terminate Father's parental rights because the evidence was legally and factually sufficient to support termination. Father responds that the applicable standard of review requires this court to defer to the factfinder's determinations if those determinations are reasonable.

### *Standard of Review*

The involuntary termination of a natural parent's rights implicates fundamental constitutional rights and "divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 683 (Tex. App.—San Antonio 2017, pet. denied) (internal quotation marks omitted). "As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent." *Id.*

At trial, the Department had the burden to show, by clear and convincing evidence, both that a statutory ground existed to terminate Father's parental rights and that termination was in M.I.A.'s best interest. TEX. FAM. CODE ANN. § 161.001; *In re A.H.*, 414 S.W.3d 802, 806 (Tex. App.—San Antonio 2013, no pet.). Because the trial court determined the Department did not satisfy that burden, M.I.A.—who challenges the legal and factual sufficiency of an adverse finding—must demonstrate that the evidence establishes all vital facts in support of termination as a matter of law. *See In re E.J.R.*, 503 S.W.3d 536, 541 (Tex. App.—Corpus Christi–Edinburg 2016, pet. denied) (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) *and In re A.L.D.H.*, 373 S.W.3d 187, 192 (Tex. App.—Amarillo 2012, pet. denied)). We will sustain a legal sufficiency challenge and reverse an adverse finding only if as a matter of law, the petitioner's evidence conclusively establishes the "contrary proposition" to the adverse finding. *See In re*

*E.J.R.*, 503 S.W.3d at 541. In other words, M.I.A. must conclusively establish that any reasonable trier of fact would have unavoidably formed a firm belief that Father had committed an act listed in section 161.001 and that termination was in the best interest of the child. *See id.*[2]

Normally, when an appellant attacks the factual sufficiency of the evidence supporting the factfinder's resolution of an issue on which he had the burden of proof at trial, he must show that the finding was against the great weight and preponderance of the evidence. *Dow Chem.*, 46 S.W.3d at 241. However, our sister courts of appeals have held that this standard is not adequate in an appeal from the denial of a petition to terminate parental rights, where the burden of proof at trial was by clear and convincing evidence. *In re A.S.*, No. 11-14-00154-CV, 2015 WL 582013, at *2 (Tex. App.—Eastland Feb. 5, 2015, no pet.); *Burns v. Burns*, 434 S.W.3d 223, 227–28 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *In re A.L.D.H.*, 373 S.W.3d at 192–93. Under those circumstances, we must review the entire record and "determine whether the trial court's failure to form a firm conviction or belief that a parent's rights must be terminated is contrary to the overwhelming weight of the evidence and clearly wrong." *Burns*, 434 S.W.3d at 227. In conducting this review, we may not reweigh the evidence or judge the credibility of the witnesses, and we must defer to the trial court's credibility determinations so long as they are not unreasonable. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). "'We examine the record in this case in light of the high evidentiary burden that [M.I.A.] bore and our required appellate deference to the trial court's decision that the evidence did not meet it.'" *In re E.J.R.*, 503 S.W.3d at 542 (quoting *Burns*, 434 S.W.3d at 227).

---

[2] The Department adopted M.I.A.'s brief on these points.

***Applicable Law***

The trial court did not make any findings about whether Father had committed acts that constituted statutory grounds for termination. TEX. FAM. CODE § 161.001. Instead, it found only that terminating Father's parental rights was not in M.I.A.'s best interest. *See id.* Because that issue is dispositive, we do not address M.I.A.'s arguments regarding statutory grounds for termination. TEX. R. APP. P. 47.1.

In deciding whether to terminate a parent-child relationship, there is a strong presumption that the child's best interest is served by maintaining the relationship between a child and the natural parent, and the Department has the burden to rebut that presumption. *See, e.g.*, *In re R.S.-T.*, 522 S.W.3d 92, 97 (Tex. App.—San Antonio 2017, no pet.). A best interest finding does not require proof of any particular factors. *In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.). However, courts may apply the non-exhaustive list of factors the Supreme Court promulgated in *Holley v. Adams*. *See id.* Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).[3]

---

[3] In addition to the *Holley* factors, courts should consider factors regarding whether a parent is willing and able to provide a child with a safe environment. TEX. FAM. CODE ANN. § 263.307. This is because promptly placing a child in a safe environment is presumed to be in a child's best interest. *Id.* However, because M.I.A. relies solely on the *Holley* factors for his best interest arguments, we will limit our discussion to the *Holley* factors.

### *Legal Sufficiency*

To prevail on his legal sufficiency challenge, M.I.A. must show that any of the evidence establishes, as a matter of law, all vital facts in support of termination. *See In re E.J.R.*, 503 S.W.3d at 541. To answer this question, we will consider whether any of the evidence the parties presented on the *Holley* factors supports the trial court's finding. *See id.*; *Holley*, 544 S.W.2d at 371–72.

<u>The desires of the child</u>

M.I.A., who was three years old at the time of trial, was too young to make his desires known. *In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.). "'The young age of the child render[s] consideration of the child's desires neutral.'" *Id.* This factor therefore does not weigh either for or against the trial court's finding. *See id.*

<u>The emotional and physical needs of the child, now and in the future</u>

Several witnesses testified that M.I.A. has severe behavioral issues, and his current foster father, David, testified that M.I.A "has a ton of anger." Father testified that he believes he can help M.I.A. work through these issues. He stated that when he heard David describe M.I.A.'s tantrums, he knew "exactly what's going on with him" because "[he] was a child much like [M.I.A.]." Father explained that he believes M.I.A. "just needs some full one-on-one attention, and that's something I can give him." Father also testified that "if that doesn't help, then I would ask to see if I can take him to go get a little evaluation. Sit down with him. Get him some counseling."

<u>The emotional and physical danger to the child now and in the future</u>

It is undisputed that Father is currently incarcerated. However, "[t]he fact that a parent is incarcerated, standing alone, does not constitute engaging in conduct that endangered a child's physical or emotional well-being." *Walker v. Dep't of Family & Protective Servs.*, 251 S.W.3d 563, 565 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

At the time of trial, Father was enrolled in a nine-month, "intensive" mentoring program that teaches anger management, communication, and coping skills. He also completed a cognitive intervention program, which he described as "gathering information and insight and thought patterns and how to make better choices and what consequences are." While there is some evidence that Father was arrested for assaultive offenses in the past, there is no evidence that he was convicted of those specific charges, and it is undisputed that he did not physically abuse Mother or M.I.A. There is also no evidence that Father uses illicit drugs.

The parental abilities of the individuals seeking custody

Father has successfully raised four step-children with a previous partner, and he has taken a two-hour parenting class offered by the jail where he is currently incarcerated. Mother testified that although Father had never met M.I.A., she believed he could be a good father to the child. Both she and Father testified that before M.I.A. was conceived, Father helped Mother provide for her two older children, checked in with her to see if the children needed anything, and did "as much as he [could] for" them. She also testified that her own decisions, not Father's, kept him from doing the same for M.I.A. and that Father consistently expressed a desire to be involved in M.I.A.'s life.

The programs available to assist these individuals to promote the best interest of the child

Father's pre-trial service plan explains that he "has knowledge of housing, SNAP, TANF, San Antonio Food Bank, and by calling 2-1-1 on his phone he can access this, he will be given all available information once contact is made." M.I.A.'s caseworker also acknowledged that Father has taken a parenting class during his incarceration, albeit of shorter duration than the Department would have approved as part of Father's service plan. Additionally, as noted above, Father testified that he was taking classes in anger management, communication, and coping skills, and that he had successfully completed a cognitive intervention program. Finally, while one of the

Department's witnesses speculated that the children's current placement might be "jeopardize[d]" if Father's rights were not terminated, the Department did not present any evidence to that effect. *See In re K.N.J.*, No. 04-18-00826-CV, 2019 WL 2784765, at *10 (Tex. App.—San Antonio July 3, 2019, no pet.) (holding that Department's failure to present evidence of cessation of children's current services weighed against termination). Other than the caseworker's speculation, there is no evidence that the trial court's refusal to terminate Father's parental rights will interfere with the services M.I.A. is currently receiving from the Department. *See In re A.H.*, 414 S.W.3d at 807 (caseworker's conclusory testimony, "even if uncontradicted," was less than a scintilla of evidence).

The plans for the child by the individuals or the agency seeking custody

Father testified that both he and his family—particularly Grandmother—can give M.I.A. "full one-on-one attention." He also testified that he plans to "[g]et [M.I.A.] some counseling" if the attention he receives from Father and Grandmother is not sufficient to address M.I.A.'s special needs. Finally, he testified that if he received custody of M.I.A., he would maintain contact between M.I.A. and his siblings.

The stability of the home or proposed placement

Father testified that when he is released from jail, he plans to live "either in southwest Houston or at [his] mother's house." He also testified that he has a steady job waiting for him when he is released. The Department did not present any evidence that Father's post-jail home or employment situation will be unstable.

The acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent

The Department's allegations at trial, and M.I.A.'s arguments on appeal, turn primarily on the undisputed fact that Father has never met M.I.A. However, both Mother and Father testified

that this lack of contact resulted from Mother's decisions, not Father's. The trial court also heard evidence that Mother at least partly made those decisions because she was afraid of her then-partner, Marcos, with whom she had a tumultuous and sometimes violent relationship. Based on that evidence, the trial court could have reasonably inferred that any attempt by Father to see or support M.I.A. during Mother's relationship with Marcos may have put Mother and the children in danger. *See In re Guardianship of C.E.M.-K.*, 341 S.W.3d 68, 81 (Tex. App.—San Antonio 2011, pet. denied) (in a legal sufficiency review, we "indulge every reasonable inference that would support the factfinder's finding").

The Department and M.I.A. also contend that Father's criminal history supports termination. Father testified, however, that several of the incidents the Department relied on at trial resulted in arrests, but not convictions. He testified that his current incarceration resulted from being pulled over while he was with a companion who had a firearm that he did not know about. He also testified that he has been trying to turn his life around since receiving confirmation that M.I.A. is his son, and that he has been voluntarily participating in programs that will help him better himself.

Conclusion

"The law requires clear and convincing evidence to sever the relationship between a parent and child and due process demands that the State document a sufficient measure of evidence in the record to support that outcome." *In re J.E.M.M.*, 532 S.W.3d 874, 891 (Tex. App.—Houston [14th Dist.] 2017, no pet.). As factfinder, the trial court had the sole authority to judge the credibility of the witnesses and to decide how much weight to give their testimony. *See Alonzo v. Alvarez*, 409 S.W.3d 754, 757 (Tex. App.—San Antonio 2013, pet. denied). Based on our review of the record, and applying proper deference to the trial court's findings and credibility determinations, we believe a reasonable factfinder could conclude that the evidence described above weighs against

terminating Father's parental rights on seven of the eight *Holley* factors. *See In re E.J.R.*, 503 S.W.3d at 541. We therefore overrule M.I.A.'s legal sufficiency challenge. *See Burns*, 434 S.W.3d at 230.

### *Factual Sufficiency*

In reviewing M.I.A.'s factual sufficiency complaint, we consider the entire record, including any evidence that does not support the trial court's finding. *See Burns*, 434 S.W.3d at 227. We may not overturn the trial court's finding unless it is so contrary to the overwhelming weight of the evidence as to be clearly wrong. *Id.*

The desires of the child

Although M.I.A. is too young to make his desires known, there is no evidence that M.I.A. and Father have any emotional bond with each other. There is ample evidence, moreover, that M.I.A. has bonded with his current foster family and his biological siblings, with whom he lived at the time of trial. M.I.A. contends that "his behavior has improved while in foster care . . . and that is as clear of an expression of preferences as a three-year-old can make." However, David testified that M.I.A.'s behavior problems "seem to be getting worse."

We must view this factor "[i]n light of the high evidentiary burden that [the Department] bore and our required appellate deference to the trial court's decision that the evidence did not meet it." *Burns*, 434 S.W.3d at 228. Under that standard of review, we do not believe the trial court's failure to form a firm conviction or belief that this factor required termination was so contrary to the overwhelming weight of the evidence as to be clearly wrong. *See id.* at 227.

The emotional and physical needs of the child, now and in the future

The CASA volunteer, the CPS caseworker, and M.I.A.'s current and former foster parents all testified that M.I.A. has frequent, severe tantrums, is destructive when he is angry, and sometimes reacts violently when he is asked to do something he does not want to do. M.I.A. argues

that as a result of these issues, M.I.A. needs permanency "[a]bove all," that he has that permanency with his current foster family, and that the trial court's refusal to terminate Father's parental rights threatens that permanency. As noted above, however, Father testified that he believes he is able to address M.I.A.'s behavioral issues. He also testified that he knows he will need to take steps to get to know his son.

David testified that he and his wife want to adopt all four children but that they are not willing to let M.I.A. have contact with his biological family if they adopt him. The CPS caseworker testified that because David and his wife want to adopt all the children, allowing Father to retain his parental rights to M.I.A. could possibly "jeopardize the placement of the other three children." Based on this testimony, M.I.A. contends that "[b]y giving [Father] more time to complete services, the court effectively guaranteed that M.I.A. would be stuck in foster care for years to come, being moved from one facility to another, and being separated from his siblings." However, the Department did not present any evidence that David and his wife would refuse to continue caring for M.I.A. or the other children if the trial court denied the petition to terminate Father's rights.

In his brief, M.I.A. characterizes Father's jail sentence as lasting "the next two years" and implies that sentence will force "M.I.A. to remain in foster care and be moved from foster home to foster home for the rest of his life." However, Father testified he is due to be released on May 23, 2020. This means that on both January 28, 2019, the day the trial began, and on June 6, 2019, when M.I.A. filed his brief in this appeal, Father had less than two years remaining in his sentence. The Department did not present any evidence at trial that the length of Father's sentence or the trial court's refusal to terminate his rights would keep M.I.A. in foster care "for the rest of his life."

The trial court, acting as factfinder, heard this evidence and found it did not satisfy the Department's high burden of proof. *See Burns*, 434 S.W.3d at 227–28. Under the exacting standard

of appellate review that we must apply here, we do not believe that this finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong. *See id.*

<u>The emotional and physical danger to the child now and in the future, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent</u>

There is some evidence that Father was arrested in 1997 for aggravated assault causing serious bodily injury, and again in 2009 for assault and bodily injury of a family member. However, there is no evidence of the details of those arrests, nor is there any evidence that Father was convicted of those charges. While Father testified that he had previously been convicted of a felony, there is no evidence about the nature of the offense that led to that conviction. Additionally, it is undisputed that while several of Mother's past romantic partners abused her, Father did not. There is no evidence that Father uses illicit drugs or that the home he plans to return to when he is released from jail is unsafe for a child. Finally, the Department did not contest Father's testimony that he has a steady job that he will return to after he is released from jail.

With regard to Father's criminal history and his lack of a current relationship with M.I.A., the trial court heard evidence explaining both issues. Both Mother and Father testified that Father's lack of contact with M.I.A. resulted from Mother's choices and decisions, not Father's. Additionally, when he was asked about his criminal background, Father testified:

> I went wrong with choices that I made from where I was growing up from outside choices I made from lack of—just thinking I could just do what I wanted, you know. Much like as [M.I.A.], you know, throw a tantrum and do what he wanted. That's how I know exactly how he is and I will show him how to control—how to control it.

The factfinder, as the sole judge of the weight and credibility of the evidence, credited Father's explanations regarding these issues. *See In re F.M.*, 536 S.W.3d 843, 844 (Tex. App.—San Antonio 2017, no pet.). Under the standard of review by which we are bound, we cannot say that decision was unreasonable. *Burns*, 434 S.W.3d at 227–28. As a result, we do not believe the trial

court's failure to form a firm conviction or belief that Father's rights must be terminated is so contrary to the overwhelming weight of the evidence as to be clearly wrong. *Id.*

<u>The plans for the child by the individuals or the agency seeking custody</u>

The Department's plans for M.I.A. consisted of adoption by M.I.A.'s current foster family. The Department presented evidence that M.I.A.'s current foster parents had raised five biological children, including three children with special needs. It also presented evidence that one of those children, like M.I.A., had "major behavioral problems growing up" but eventually grew into a successful adult. Finally, the Department presented evidence that M.I.A. is bonded to his foster family and that it is in his best interest to remain in the same placement as his siblings. However, David testified that M.I.A.'s behavior problems seem to be worsening in his current placement.

M.I.A.'s brief contends that Father "has no specific plans for his son." While the evidence in favor of Father's position on this issue is limited, we believe a reasonable factfinder could credit it in favor of the trial court's finding. *See Burns*, 434 S.W.3d at 227–28. As a result, we hold that the trial court's failure to form a firm conviction or belief that this factor required termination of Father's rights was not so contrary to the overwhelming weight of the evidence as to be clearly wrong. *See id.*

<u>Conclusion</u>

Based on our review of the entire record, and applying proper deference to the trial court's findings and credibility determinations, we cannot say that the trial court's failure to form a firm conviction or belief that termination of Father's rights was in the best interests of M.I.A. is so contrary to the overwhelming weight of the evidence as to be clearly wrong. *See id.* For that reason, we overrule M.I.A.'s factual sufficiency challenge. *See id.* at 230.

### *Grandparent Visitation*

M.I.A. also complains that the trial court abused its discretion by *sua sponte* awarding visitation rights to Grandmother because there was no evidence to support an award of grandparent access under section 153.433 of the Family Code. Father responds that section 153.433 does not apply here. According to Father, because the trial court denied the petition to terminate his parental rights, it was required to render any order it believed to be in the child's best interest.

### *Standard of Review*

In family law cases, we review a trial court's orders regarding visitation for abuse of discretion. *In re T.K.D.-H.*, 439 S.W.3d 473, 481 (Tex. App.—San Antonio 2014, no pet.). "A trial court abuses its discretion, so as to require reversal, when it acts arbitrarily or unreasonably without reference to any guiding rules or principles." *Alvarez v. Alvarez*, No. 04-13-00787-CV, 2015 WL 1938700, at *1 (Tex. App.—San Antonio Apr. 29, 2015, no pet.). A trial court has "wide latitude" on issues of custody, control, possession, and visitation. *Brendel v. Brendel*, No. 04-08-00883-CV, 2009 WL 3789604, at *1 (Tex. App.—San Antonio Nov. 11, 2009, no pet.).

### *Applicable Law*

Section 153.433 provides that in a suit affecting the parent-child relationship (SAPCR), a trial court "may order reasonable possession of or access to a grandchild by a grandparent if" a grandparent requesting possession or access makes certain showings. TEX. FAM. CODE ANN. § 153.433. In contrast, section 161.205 provides that when a trial court declines to terminate a parent's rights in a SAPCR brought by a governmental entity, the court "shall render any order in the best interest of the child." TEX. FAM. CODE ANN. § 161.205.

### *Analysis*

The proper interaction, if any, between sections 153.433 and 161.205 appears to be a question of first impression. Because this is a question of statutory interpretation, we review it de

novo. *In re C.Y.K.S.*, 549 S.W.3d 588, 591 (Tex. 2018). In construing a statute, we determine the Legislature's intent by examining the plain language used. *Grubbs v. ATW Invs., Inc.*, 544 S.W.3d 421, 423 (Tex. App.—San Antonio 2017, no pet.). If the statute's language is unambiguous, we apply it according to its plain meaning. *Id.*

Neither M.I.A. nor the Department have addressed the applicability of section 161.205 to this dispute. Instead, they argue that section 153.433 controls here, and that the lack of pleadings and evidence to support a ruling under that statute is fatal to the trial court's order. This court has recognized, however, that the Legislature intended for section 153.433 to "limit a court's jurisdiction over non-parental intrusion into the parent-child relationship" in order to safeguard parents' constitutionally protected interests in the care, custody, and control of their children. *In re Pensom*, 126 S.W.3d 251, 255 (Tex. App.—San Antonio 2003, orig. proceeding); *see also* TEX. FAM. CODE § 153.433(a)(2) (grandparent requesting possession or access under section 153.433 must overcome "the presumption that a parent acts in the best interest of the parent's child"). The statute "is narrowly tailored so that a *parent's* personal affairs are not needlessly intruded upon or interrupted by the trauma of litigation by any third party seeking access." *Pensom*, 126 S.W.3d at 255 (emphasis added).

A proceeding like this one, where the Department sought to terminate the parent-child relationship altogether, represents the pinnacle of such an intrusion. *See Santosky v. Kramer*, 455 U.S. 745, 758 (1982) ("When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. If the State prevails, it will have worked a unique kind of deprivation.") (internal quotation marks omitted); *In re N.G.*, 577 S.W.3d 230, 236 (Tex. 2019). We do not believe the Legislature intended for a statute that protects against intrusion into a *parent's* personal affairs to be wielded as a post-judgment sword by a non-parent who is challenging a trial court's refusal to terminate parental rights. *See Pensom*, 126

S.W.3d at 255. This is especially true where, as here, the only natural parent whose rights have not been terminated has not raised any complaints about the trial court's judgment. For that reason, we hold that section 153.433 does not apply to this case.

Father argues that section 161.205 requires us to affirm the trial court's order, and we agree. As written, section 161.205 confers broad discretion on a trial court that has decided not to terminate a parent's rights in a SAPCR initiated by the government. TEX. FAM. CODE § 161.205; *cf. In re Geomet Recycling LLC*, 578 S.W.3d 82, 91 n.2 (Tex. 2019) (recognizing that a rule allowing a court to issue "any order" grants "broad authority"). It authorizes—and in fact requires—the court to render *any* order it determines is in the child's best interest. TEX. FAM. CODE § 161.205. And unlike section 153.433, section 161.205 does not contain any specific pleading or proof requirements. *Compare id.*, *with* TEX. FAM. CODE § 153.433. The Waco Court of Appeals recently cited section 161.205 to affirm a trial court's order that "grant[ed] relief on unpleaded theories, on a theory that was not tried by consent," even though there was "no express statutory authority" for the order in question. *In re R.W.K.*, No. 10-16-00393-CV, 10-16-00396-CV, 2017 WL 19574444, at *2 (Tex. App.—Waco May 10, 2017, no pet.). Similarly, this court has repeatedly relied on section 161.205 to hold that a trial court did not abuse its discretion by appointing nonparties as managing conservators of a child, even when those nonparties did not affirmatively petition for conservatorship. *See In re A.N.S.*, No. 04-17-00374-CV, 2017 WL 4518280, at *1–2 (Tex. App.—San Antonio Oct. 11, 2017, no pet.); *In re V.H.*, No. 04-16-00054-CV, 2016 WL 3797237, at *3 (Tex. App.—San Antonio July 13, 2016, no pet.); *In re A.D.*, 480 S.W.3d 643, 645–46 (Tex. App.—San Antonio 2015, pet. denied). We agree with Father that it makes little sense to conclude that the Legislature intended for section 161.205 to give the trial court authority to appoint a nonparty managing conservator, but not to order visitation for a nonparty. *See, e.g.*, *In re A.N.S.*, 2017 WL 4518280 at *1.

The evidence shows that although Father is currently incarcerated and has never met his son, he comes from a large, close-knit family. Although the trial court refused to terminate Father's parental rights and awarded him supervised visitation with M.I.A., its order specifies that those visits will not begin until after Father is released from jail. Under these circumstances, we believe that the trial court did not behave arbitrarily or unreasonably by concluding that therapist-supervised visits between M.I.A. and his paternal grandmother before Father is released from jail would serve as an appropriate introduction between M.I.A. and his natural father's family and would therefore be in M.I.A.'s best interest. TEX. FAM. CODE § 161.205; *see Alvarez*, 2015 WL 1938700 at *1. For that reason, we overrule M.I.A.'s challenge to the portion of the trial court's judgment that grants visitation rights to Grandmother.

## CONCLUSION

We affirm the trial court's order.

Beth Watkins, Justice